UNITED STATES v. CERONE et al.

(two cases).

SAME v. ALOISIO et al.

Nos. 8791, 8796, 8797.

Circuit Court of Appeals, Seventh Circuit.

June 30, 1945.

Rehearing Denied July 23, 1945.

Writ of Certiorari Denied Oct. 22, 1945.

See 66 S.Ct. 98.

Victor E. La Rue, Thomas F. Reilly, Gerald T. Wiley, and James C. Leaton, all of Chicago, Ill., for appellants.

J. Albert Woll, U. S. Atty., and William J. Connor and George G. Kelly, Asst. U. S. Attys., all of Chicago, Ill., for the United States.

Before EVANS, MAJOR, and KERNER, Circuit Judges.

MAJOR, Circuit Judge.

These three appeals are from judgments wherein the defendants were, after trial by jury, convicted of violating Sec. 311, Title 50 U.S.C.A.Appendix. There were two indictments upon which separate trials were had. Frank John Cerone and James Cerone, appellants in 8791, were tried and convicted in one case; George Sam Aloisio and William Aloisio, appellants in 8796, and Frank John Cerone, appellant in 8797, were tried and convicted in another case. Frank John Cerone, appellant in 8797, has perfected a separate appeal. Thus the appeal in 8791 is from one judgment and the appeals in 8796 and 8797 are from another judgment.

For the purpose of argument and presentation to this court, the appeals were consolidated and may be appropriately disposed of in one opinion. The indictments in the two cases charged the same offense in precisely the same language, the questions raised before this court are similar and the testimony relied upon by the government in support of the judgments is of the same nature. In appeal 8791, it was charged that the defendant James Cerone evaded service in the land or naval forces of the United States and that the defendant Frank John Cerone aided and abetted in the evasion of such service. In appeals 8796 and 8797, it was charged that defendant George Sam Aloisio evaded service in the land or naval forces and that William Aloisio and Frank John Cerone aided and abetted in the evasion of such service. The manner of the evasion as described in each indictment was that the defendants by the offer and promise of certain sums of money to certain United States naval personnel assigned to service in the Armed Forces Induction Station at Chicago, Illinois, persuaded and induced such personnel to make false, untrue and fraudulent entries upon the record of examination commonly called the "Buck Sheet" while the defendants were being examined as to physical and mental fitness for services in the Armed Forces, and that by means of such entries the defendants were rejected for service.

The principal errors assigned are (1) that the indictments were insufficient, (2) that the defendants were entitled to a more specific bill of particulars, (3) that defendants' challenge to the venire should have been allowed, (4) that the argument of government counsel to the jury was improper, and (5) that defendants were entitled to a directed verdict. We think there is no reason to enter into a detailed discussion as to (1), (2) and (3). It is sufficient to state that the indictment charged the offense substantially in the language of the statute upon which it was predicated and we think it was sufficient. The court required the government to furnish a bill of particulars, which the defendants contend should have been more specific. We are of the view that the bill of particulars as furnished was adequate and that the challenge to the venire was properly denied.

The question raised by the court's refusal to direct a verdict is of sufficient importance to require a brief summary of the proof relied upon by the government. The defendants James Cerone and George Aloisio were both registered with Local Board No. 118, the former having been ordered to report for a pre-induction physical examination on May 24, 1944, and the latter to report for such examination on May 12, 1944. Each of these defendants was rejected as physically unfit on the dates they were ordered to report. The controversy concerning the court's refusal to direct a verdict revolves around the manner in which these rejections were procured. More specifically, the question for decision is whether the manner of their procurement constitutes entrapment as claimed by the defendants. The defense of entrapment was invoked at the trial, and the court's charge to the jury was as fair and impartial as the defendants could expect; in fact, no objection was raised to the court's charge in this respect, and it is not now argued but that the jury was properly instructed as to the law of entrapment. Under such circumstances in order to justify a reversal because of the court's refusal to direct a verdict, it would be necessary for us to hold as a matter of law that entrapment was shown.

No more than a brief statement of the facts is necessary to show that the issue presented to this court must be decided adversely to the defendants. In March, 1944, Frank Cerone made arrangements with Chief Petty Officer Stephenson, a navy man assigned to the induction station at Chicago, by which the latter agreed to bring about certain rejections by falsely marking a registrant's "Buck Sheet." As a result of this plan, several rejections were procured for Cerone's friends. Stephenson was paid $1,000 for each rejection. Sometime during these operations, Stephenson sought to enlist the assistance of Chief Petty Officer Curran (also assigned at the induction station) in securing fraudulent rejections. Upon learning of Stephenson's activities, Curran reported the matter to his superior officers and the Federal Bureau of Investigation, who instructed him to go along with Stephenson in the plan. An understanding was had between Stephenson and Curran, by which a registrant was to drop out of the medical line at a certain point, conceal his "Buck Sheet" so that the military police stationed in the induction center would not see it, then proceed to Curran's office where Curran would stamp his papers, "Rejected by the Armed Forces," stating the reasons therefor, whereupon the registrant was to return to the line as a reject.

On April 23, 1944, Stephenson was taken to the office of the Federal Bureau of Investigation where he made a statement concerning certain fraudulent rejections which he had previously produced. He was not retained in custody but was permitted to remain on duty. Subsequently, his activities relative to fraudulent rejections, as well as those of Curran, were with the knowledge, consent and approval of the Federal Bureau of Investigation.

On May 22, 1944, Stephenson met Frank Cerone at the latter's request and was told that Cerone's brother James was to come up for pre-induction physical examination on May 24; that Frank Cerone wanted his brother James rejected and would pay Stephenson $500 for the rejection. Arrangements were made for a meeting between the two Cerones, Curran and Stephenson in a tavern. Such meeting was had on May 23, at which the procedure to procure the rejection of James Cerone on the following day was discussed. James Cerone was told that "under no circumstances was he to identify either Stephenson or Curran in the event he should be questioned regarding his rejection." He was instructed how to proceed in the line, when to fall out, and that he should then go to Curran's office where his papers would be altered. The procedure was followed according to arrangements, James Cerone was rejected and Stephenson was paid $500 by Frank Cerone for effecting such rejection.

On May 10, 1944, Stephenson, in response to a telephone call from Frank Cerone, met the latter and William Aloisio, at which time Frank Cerone introduced William Aloisio as his partner. At this meeting it was suggested by Cerone that William Aloisio's younger brother was due for his pre-induction examination. Stephenson was told that the registrant did not have any money and was requested to procure his rejection for $500, with the suggestion that the difference could be made up on some other registrant, whereupon Stephenson promised to take the matter up with Curran. William Aloisio, at this meeting, produced his brother's appearance notice and arrangements were made for a meeting the following day. The parties met on the following day and discussed the plan of effecting George Aloisio's fraudulent rejection. George was told that Curran would take care of him, and Curran instructed him "just to follow my directions." Thereupon, Curran took George over to the induction center so as to familiarize him with the procedure to be followed. On the next day, May 12, George Aloisio reported to the induction center and went through the line to a certain point, whereupon he left the line and went to Curran's office. Curran made certain notations on his "Buck Sheet" and stamped it "Rejected by the Armed Forces." Aloisio then resumed his place in the line and was rejected for service. He returned to Curran's office, stated "I am rejected," and thanked him for his service. On the same day, Frank Cerone paid Stephenson $500 for effecting this rejection.

Defendants contend that these facts bring the case squarely within the reasoning of Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413, 86 A.L.R. 249. We do not agree. Notwithstanding that the facts in the Sorrells case furnish stronger support for the defense of entrapment than those of the instant case, the court did not hold that entrapment was disclosed as a matter of law. While the Supreme Court reversed the conviction, the reversal was predicated on the error of

the trial court in its refusal to submit the issue of entrapment to the jury. In other words, the court held that the facts relative to entrapment were such that the defendant was entitled to have the issue decided by the jury. As already pointed out, in the instant case this issue was fairly and adequately submitted to the jury and the jury decided it against the defendants.

Moreover, the law of entrapment as announced in the Sorrells case makes it doubtful if the facts of the instant case warranted the submission of the issue to the jury. Certainly, defendants are in no position to complain since the issue was submitted and decided adversely to their contention. The court in the Sorrells case (287 U.S. at page 441, 53 S.Ct. at page 212, 77 L.Ed. 413, 86 A.L.R. 249) stated: "It is well settled that the fact that officers or employees of the government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises."

Again, the court on page 445 of 287 U. S., at page 214 of 53 S.Ct. quoted with approval: " 'When the criminal design originates, not with the accused, but is conceived in the mind of the government officers, and the accused is by persuasion, deceitful representation, or inducement lured into the commission of a criminal act, the government is estopped by sound public policy from prosecution therefor.' "

We think there is little, if any, room for the contention that the defendants in the instant case were induced, persuaded or lured by those acting on behalf of the government to evade military service. The criminal intent originated in the minds of the defendants and the purpose accomplished was for their benefit and at their request and instigation. The most that can be said is that the government afforded the facilities for the carrying into effect of the defendants' criminal intent and for the accomplishment of the purpose which they sought. Such action on the part of the government does not constitute entrapment.

The Aloisio defendants also complain that prejudicial argument was made to the jury by government counsel. The only defendant who took the witness stand was William Aloisio who, when asked his business, stated without objection that he was a gambler. Government counsel in his argument characterized Aloisio as he had characterized himself, as a gambler. Counsel further stated, "Now, gambling is an illegal enterprise in Illinois." The objection to this statement is that certain kinds of gambling are not illegal in Illinois. We need not decide this irrelevant issue. In view of the defendant's voluntary statement as to his business, we do not think the argument was prejudicial. Furthermore, while there was some discussion between counsel and the court as to the accuracy of the statement made by government counsel, counsel for the defendants expressly stated that he was not pressing his objection.

After a careful study of the record and the errors assigned, we are of the opinion that the defendants had a fair and impartial trial and were properly convicted. In fact, it is difficult to discern how a jury could rationally have arrived at a different verdict. The judgments are affirmed.