### UNITED STATES v. BRANDENBURG.
### No. 9268.

Circuit Court of Appeals, Third Circuit.
Argued March 6, 1947.
Decided July 2, 1947.

Frederic M. P. Pearse, of Newark, N. J., for appellant.

Charles A. Stanziale, Asst. U. S. Atty., of Newark, N. J. (Edgar H. Rossbach, U. S. Atty., of Newark, N. J., on the brief), for appellee.

Before BIGGS, GOODRICH and O'-CONNELL, Circuit Judges.

O'CONNELL, Circuit Judge.

On January 30, 1945, defendant, a doctor, was indicted on 11 counts charging him

with violation of the Harrison Anti-Narcotic Act, § 2, 26 U.S.C.A. Int.Rev.Code, § 2554. Trial resulted in conviction on all counts. He appealed. This court, after finding the indictment and the government's proof sufficient, ordered a new trial because hearsay statements written on the back of several exhibits were permitted to go out with the jury. 1946, 3 Cir., 155 F.2d 110. Subsequently brought to trial again on substantially the same testimony as was adduced at the first trial, defendant was found not guilty on the first count but guilty of counts 2 to 11, inclusive. Defendant then moved to set aside the verdict on counts 2 to 11, on the ground of alleged irregularities involving one of the jurors. A hearing was held, following which the motion was denied. Appeal has been taken from the judgment thereafter entered.

Our previous opinion, 3 Cir., 155 F.2d 110, at page 112, outlines the proof submitted by the government. For the purposes of the appeal at bar, we need note only that one Humphries, a dope addict, visited defendant's office and, on the representation that he was a patient of a Dr. Brady and had gall bladder trouble, secured from defendant a prescription for 100 quarter-grain tablets of morphine sulphate. Unable to get this prescription filled, Humphries returned to defendant and was given two prescriptions calling for 50 tablets each.

Approximately two months later, Humphries became a government informer and renewed his visits to defendant's office. It appears that, on each visit, Humphries would receive one or more prescriptions for substantial quantities of morphine sulphate without having been given a physical examination. Five dollars was paid defendant for each such visit.

On August 22, 1944, Humphries introduced as his "brother-in-law" one Van Pelt, a government agent. Van Pelt, intimating that he had had tuberculosis, likewise was given sizable prescriptions for morphine sulphate on several occasions. On September 9, 1944, defendant told Humphries and Van Pelt that he had received a call from a drug store asking if Van Pelt was an addict; that "if there was any trouble started that he [defendant] would like to get at it

at the first"; that "it is like a snowball that you roll, the more you roll it the larger it gets"; that Van Pelt and Humphries were to be careful, "and do not do anything that will bring the boys in blue around"; and that the next time the "income tax people" came, they could "look for their own records." Both Humphries and Van Pelt were given prescriptions not only at that time but also at a later date.

Humphries also testified that, in a period of about five months, defendant had given him about 125 prescriptions calling for 2,-500 to 3,000 tablets of morphine sulphate. With these details in mind, we shall examine in order the six grounds for reversal assigned by defendant.

■ First. Defendant urges that the trial court erred in admitting in evidence prescriptions and the drugs secured therewith. Defendant's position is grounded upon two assertions: (a) that a physician in prescribing, but not administering, drugs does not "sell" the drugs within the meaning of 26 U.S.C.A. Int.Rev.Code, § 2554, and (b) that defendant had been entrapped because the prescriptions on which counts 2 to 11 of the indictment are based were given to, and all money was furnished by, government agents. The former assertion was carefully considered and rejected in our earlier opinion, 155 F.2d 110, at page 111. The second requires further discussion.

Probably the leading case involving entrapment is Sorrells v. United States, 1932, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413, 86 A.L.R. 249. In that case, the majority of the Supreme Court held that entrapment was a jury question, even though the government agent asked the defendant three times to secure liquor for him, and although there was no evidence that the defendant had ever sold or possessed liquor previously. The minority view was that, as a matter of law, the lower court should have quashed the indictment rather than submit the issue to the jury. Both the majority and minority opinions contain language highly critical of the conduct of the government agent; but the majority did recognize the validity of actions which merely gave the defendant the opportunity to commit the

offense. The majority of the court said, 287 U.S. 435, at page 441, 53 S.Ct. 210, at page 212, 77 L.Ed. 413, 86 A.L.R. 249, "It is well settled that the fact that officers or employees of the government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises." Cited in both the majority and minority opinions was Casey v. United States, 1928, 276 U.S. 413, 48 S.Ct. 373, 72 L.Ed. 632, in which the conviction of an attorney under the Anti-Narcotic Act was upheld, although defendant in that case had been asked to procure morphine by the supposed stool pigeon.

Since the decision in the Sorrells case, the same issue of entrapment has been presented to several of the circuit courts of appeals. With only one exception, the reasoning of the Sorrells majority opinion has been followed. United States v. Lindenfeld, 2 Cir., 1944, 142 F.2d 829, certiorari denied 323 U.S. 761, 65 S.Ct. 89, 89 L.Ed. 609; United States v. Abdallah, 2 Cir., 1945, 149 F.2d 219, certiorari denied 326 U. S. 724, 66 S.Ct. 29, 90 L.Ed. 429. And see Wall v. United States, 5 Cir., 1933, 65 F.2d 993; Meyer v. United States, 9 Cir., 1933, 67 F.2d 223; Louie Hung v. United States, 9 Cir., 1940, 111 F.2d 325; Weathers v. United States, 5 Cir., 1942, 126 F.2d 118, certiorari denied 316 U.S. 681, 62 S.Ct. 1267, 86 L.Ed. 1754; United States v. Cerone, 7 Cir., 1945, 150 F.2d 382, certiorari denied Aloisio v. United States, 326 U.S. 756, 66 S.Ct. 97, 90 L.Ed. 454; and Shaw v. United States, 6 Cir., 1945, 151 F.2d 967. But cf. Morei v. United States, 6 Cir., 1942, 127 F. 2d 827. In the Morei case, supra, the court, stressing the fact that government agents had induced that defendant to violate the law, cited the minority opinion of the Sorrells case to support the conclusion that entrapment had existed as a matter of law.

Very close to the case at bar are the Lindenfeld and Abdallah cases, supra. In those cases, as well as that before us, physicians were convicted of violation of the Anti-Narcotic Act, although the prescriptions were secured and money supplied by government agents; in all three cases, the issue of entrapment was decided adversely to the accused by the jury.

Examination of the charge of the court in the instant case reveals that the entrapment question was fairly and adequately submitted to the jury. Since the prescription on which the first count of the indictment was based concededly did not involve entrapment,[1] the verdict of guilty on counts 2 to 11 necessarily meant that the jury decided that entrapment had not been present in this case.

■ We conclude, therefore, that the defense of entrapment was no bar to the introduction of the prescriptions and drugs into evidence.

Second. Defendant states that "the methods employed by the Government agents to entrap the defendant were repugnant to justice * * *" This contention has been considered and rejected above.

■ Third. Defendant alleges that there was a fatal variance between the charges in the indictment and the proof. We disposed of this contention in our previous opinion. 3 Cir., 155 F.2d 110, at page 112. There was ample evidence to support the jury's conclusion that neither Humphries nor Van Pelt were suffering from a disease which required the administration of morphine sulphate.

■ Fourth. Defendant assigns as error the admission of testimony concerning the character of and the examination made by defendant before he prescribed for Humphries and Van Pelt. We are of the opinion that this testimony was competent. As we stated in our previous opinion, a physician who prescribes drugs in bad faith, not in the course of his professional practice only and for the purpose of satisfying the cravings of drug addicts, is guilty of an indictable offense. The testimony introduced was proper in determining the question of fact; viz., whether or not defendant had prescribed in good faith.

■ Fifth. Defendant urges that the verdict was contrary to the charge of the

---

[1] Humphries, who secured that prescription, was not a government informer at the time. The money which he paid to defendant was his own.

court concerning entrapment. On the facts, this case is certainly no stronger than those in Sorrells, Lindenfeld, and Abdallah cases, supra. There was ample evidence to support the jury's finding that the purpose of the government agents was to ascertain that defendant was already engaged in an unlawful business, and not to induce or solicit the commission of crime. Cf. Dear Check Quong v. United States, App.D.C., 1947, 160 F.2d 251, and Macaboy v. United States, App.D.C., 1947, 160 F.2d 279.

Sixth. Defendant contends that the verdict should have been set aside when the court was informed of the conduct of one of the members of the jury and his wife. It appears that, in accordance with the present usual practice, the judge permitted the jurors to disperse at noon recesses and at the conclusion of each trial day, with the admonition given on all such occasions that they were to discuss the case with nobody. One Danielson, a juror, who was under doctor's orders not to attend the trial but insisted, nevertheless, on doing so, was driven between the locale of the trial and his home by his wife, who sat as a spectator during several days of the trial. A lady who had the duty of guarding the jury testified that she had told Danielson that "it would be better" if his wife did not attend the trial. There was further testimony that Mrs. Brandenburg, wife of defendant and allegedly hostile to him, was likewise in attendance at the trial and spoke to Mrs. Danielson. One witness, a Harry Willard, testified that he overheard a conversation between Mrs. Brandenburg and Mrs. Danielson, in which the former was alleged to have said something about an abortion ring, a child, a letter, a wristband, that she was "afraid of her life," and that "if her son was there he could testify as to what happened in his office, and so on." On cross-examination, Willard further testified that he had met defendant casually on two occasions; that he had read of the trial in a newspaper and attended every day except the last, but did not speak to defendant at the trial; and that inexplicably he had been called by defendant on the telephone after the verdict, and was told by

defendant of a lady talking to Mrs. Brandenburg, "and at that time I remembered the incident that happened over there." On the other hand, a Harry Simon, to whom Willard alleged he reported the conversation between Mrs. Brandenburg and Mrs. Danielson, denied that Willard had said to him anything other than that Mrs. Brandenburg "is crazy. I wish she wouldn't talk to me." Mrs. Danielson denied that Mrs. Brandenburg had said anything about defendant, and added that she had "had no conversation whatever with Mrs. Brandenburg before the jury was out." Counsel for defendant objected to having Mrs. Danielson testify whether she had discussed the case with her husband. A Miss Rhodes gave testimony tending to corroborate Mrs. Danielson's version of the conversation had with Mrs. Brandenburg. Finally, Danielson, the juror, categorically denied that he had discussed the case with any one.

The trial court thereupon found nothing which would lead to the belief that the verdict was reached in any way other than "by a conscientious observance of the oath which every juror took." He pointed out the suspicious nature of Willard's testimony and stated that he considered unwarranted the attempt to cast aspersions upon the integrity of Danielson and Mrs. Danielson.

In Higgins v. United States, App.D.C., 1946, 160 F.2d 222, a juror was seen talking to the mother of the accused. Hearing was held, at which the juror testified to not having been influenced as a juror by the statements the mother had made. Denial of the motion for a new trial was affirmed on appeal.

In Rabideau v. United States, 7 Cir., 1930, 40 F.2d 909, defendant moved for a mistrial at the close of the evidence, on the asserted ground that one of the jurors had at one time been a deputy clerk of a state circuit court. Conviction of that defendant was affirmed in a per curiam opinion, in which the appellate court said that the prior position of the juror would have been no lawful ground for challenge for cause, "and, besides, such matters are within the court's discretion, and nothing appears to indicate any abuse of its discretion."

984

Applying these decisions to the somewhat novel question presented by the case sub judice, we find that, had defendant raised this issue prior to the retirement of the jury and had the same evidence been taken, the judgment of the trial judge would have been conclusive. See Hopt v. People of Territory of Utah, 1887, 120 U.S. 430, 435, 7 S.Ct. 614, 30 L.Ed. 708. Moreover, we cannot say that the trial court abused its discretion in determining, after personal observation of the demeanor of the witnesses and consideration of the testimony adduced, that Danielson had not violated his oath as juror. Cf. Eagle Lake Improvement Co. v. United States, 5 Cir., 1947, 160 F.2d 182, 184.

Affirmed.