**UNITED STATES of America**

v.

**Eric R. CLARKE and Horace R. Johnson.**

**Crim. No. 21319.**

United States District Court
E. D. Pennsylvania.

Dec. 27, 1963.

**648**

Drew J. T. O'Keefe, U. S. Atty., Joseph H. Reiter, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

John Rogers Carroll, Philadelphia, Pa., for defendant Eric R. Clarke.

Robert N. C. Nix, Jr., Philadelphia, Pa., for defendant Horace R. Johnson.

CLARY, Chief Judge.

Defendants, Eric R. Clarke, M. D., and Horace R. Johnson, M. D., were indicted as of the above captioned number in a true bill returned on February 6, 1963. The indictment was laid in six Counts, charging both defendants, in Count 1, with conspiracy to violate the Narcotic Laws of the United States, Title 18 U.S.C. § 371.

Defendant, Clarke, was charged in Counts 2, 4, 5 and 6 with various unlawful sales of cocaine and dolophine tablets on March 15, 22, April 4 and 11, 1962.

Defendant, Johnson, was charged in Count 3 with the sale of cocaine on March 15, and in Counts 4 and 6 with sales of dolophine pills and cocaine on March 22 and April 11, 1962, which sales were not pursuant to a written order of the Secretary of the Treasury, and not in the course of professional practice of said defendants, and not for legitimate medical needs, all in violation of Title 26 U.S.C. § 4705(a). Both defendants were arraigned and pleaded not guilty.

*History of the Litigation*

The first trial of this case before the Honorable C. William Kraft, Jr. and a jury started on April 22, 1963, continued through the 23rd, 24th, 25th and 26th, and the jury returned its verdict against both defendants of guilty as charged in the indictment, on April 29, 1963. After consideration of motions for judgment of acquittal and for a new trial, Judge Kraft, in an Opinion filed August 2, 1963, denied the motion for judgment of acquittal but granted a new trial as to both defendants, United States v. Clarke and Johnson, D.C.E.D.Pa., 220 F.Supp. 905. The fundamental reason for granting a new trial assigned by Judge Kraft

in his Opinion, was that in fairness to the defendants, the "informer" or "special employee" of the Treasury Department should have been produced, particularly in view of their defense of entrapment. The case was set for trial in September of 1963 and was tried to a jury on September 10, 11 and 12, on which date, because of testimony by one of the Treasury Agents that the defendants had been under surveillance for approximately a year, Judge Kraft, on motion of defendants' counsel, withdrew a juror.

Trial No. 3 started on November 22, 1963, the date of the assassination of President John F. Kennedy. Only a relatively few pages of testimony had been taken when the Court recessed for lunch. When word was received of the President's assassination, the Court adjourned the afternoon session, and because of President Johnson's Proclamation of a National Day of Mourning on November 25, 1963, the trial did not resume until Tuesday, November 26, 1963. The trial continued through Wednesday, November 27, when the testimony was concluded and the Court recessed for Thanksgiving Day. The speeches and Charge of the Court were given on Friday, November 29, 1963 when the jury again returned a verdict finding Doctor Clarke guilty on Counts 1, 2, 4, 5 and 6, as charged in the indictment, and Doctor Johnson guilty on Counts 1, 3, 4 and 6, as charged in the indictment.

*Motions for New Trials*

Both defendants filed identical motions for new trials and for judgments of acquittal. The reasons assigned in each are as follows:

"1. The verdict is contrary to the evidence.

"2. The verdict is against the weight of the evidence.

"3. The verdict is contrary to law.

"4. The trial court erred in refusing to withdraw a juror after a Government witness testified to prior misconduct on the part of the defendant Clarke which testimony was stricken by the Court at the time.

"5. The trial court erred in refusing to withdraw a juror notwithstanding the disruption of the continuity of the trial by the Assassination of the President of the United States and its attending circumstances.

"6. The trial court erred in its instructions to the jury on the definition of the term 'sale'."

The first three need little discussion at this point in the Opinion. They will be covered in detail in discussion of the motions for judgments of acquittal. They are utterly without merit as will be later demonstrated.

The fourth reason that the trial Court erred in refusing to withdraw a juror after a Government witness testified to *possible* prior misconduct on the part of the defendant Clarke which testimony was stricken by the Court at the time, does merit some discussion. This was the third trial of a serious case. The Court was extremely sensitive to the implications which might arise from any improper or volunteered information in the light of occurrences at the previous trial, which had resulted in a mistrial. The occurrence complained of is stated at page 82 of the Notes of Testimony as follows:

"Q. In driving Dr. Clarke was there any conversation during that drive home?

"A. I am not sure whether the conversation was in the car or back at the office, but there was other conversation where Dr. Clarke told me that he furnished a considerable amount of cocaine to a fellow in New York City.

"Mr. Carroll: I object.

"Mr. Reiter: I withdraw that question.

"Mr. Carroll: I move for the withdrawal of a juror.

"Mr. Nix: I join in that on behalf of Dr. Johnson.

"The Court: Denied. The jury will disregard anything that they have just heard in the last minute.

"By Mr. Reiter:

"Q. Was there any conversation concerning a future meeting?

"A. Yes. Dr. Clarke told me to get in touch with him the following week and that he would have an ounce of cocaine and 2,000 Dolophine tablets."

The jury had earlier been instructed with respect to certain conversations that they could only accept evidence of the conversations against the individuals involved. On the happening of the foregoing situation, the Court, promptly and in no uncertain tone, instructed the jury to disregard the objectionable evidence. Bearing in mind that the defendants' interests must at all times be protected, the Court, at the time of the instruction to the jury to disregard the testimony, looked directly at the jury to determine the effect of the prompt and direct instruction. It was heartening to the Court to see all of the jurors, including the alternates in the box, nod unanimous assent to the instruction of the Court.

At this juncture of the case, it is only the trial Judge who can determine the effect on the jury of prompt and direct instruction. It was the considered judgment of the Court that the jury had understood the instruction, had accepted it, and that they thereafter did not consider the stricken testimony in further deliberation of the case. As was stated in Delli Paoli v. United States, 352 U.S. 232, 242, 77 S.Ct. 294, 1 L.Ed.2d 278:

"It is a basic premise of our jury system that the court states the law to the jury and that the jury applies that law to the facts as the jury finds them. Unless we proceed on the basis that the jury will follow the court's instructions where those instructions are clear and the circumstances are such that the jury can reasonably be expected to follow them, the jury system makes little sense. Based on faith that the jury will endeavor to follow the court's instructions, our system of jury trial has produced one of the most valuable and practical mechanisms in human experience for dispensing substantial justice."

The instruction in the instant case was prompt and clear and removed any possible prejudice to the defendants because of the testimony in question. To say the jury disregarded the Court's instruction on this one statement is to engage in pure speculation which is unfounded. Had the Court any idea that this episode would prejudice the defendants in the jury's mind, the Court would not have hesitated for one minute in withdrawing a juror. While occurrences such as these are unfortunate, unless defendants' rights are prejudiced, the trial should not be unduly called off or delayed. It is the considered judgment of the Court that this occurrence did not react to the detriment of the defendants.

I have considered all of the cases advanced by the defendants in their brief and find that none of the cases cited, Cole v. Arkansas, 333 U.S. 196, 68 S.Ct. 514, 92 L.Ed. 644, Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L. Ed. 790, and Hansford v. United States, 112 U.S.App.D.C. 359, 303 F.2d 219 (1962), are apposite.

Cole v. Arkansas, 333 U.S. 196, 68 S. Ct. 514, 92 L.Ed. 644 is clearly inapplicable in that it dealt with a conviction for an offense under an Arkansas statute for which the defendants had not been charged, i. e., the defendants were charged with violating one section of a statute and convicted of violating a different section of the same statute. The Court held that this violated procedural due process in that defendants had a right to notice of the specific charge and a chance to be heard in a trial of the issues raised by that charge. It cannot be seriously contended that the statement which was inadvertently made by the witness in the instant case, and which was immediately stricken, is analogous to the situation in Cole.

Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790, is likewise inappropriate in that it dealt with the scope of the co-conspirators' exception to the hearsay rule. The Court there held that the utterance of a co-conspirator made after the termination of the conspiracy was inadmissible against other co-conspirators and it was error to allow it into evidence. The instant case, however, does not in any way involve the admission of any evidence, nor does it involve any aspects of the hearsay rule of evidence, but, on the contrary, the Court did not admit the evidence but rather had it stricken, and instructed the jury to disregard it immediately after the statement was made.

Lastly, the defendants rely on Hansford v. United States, 112 U.S.App.D.C. 359, 303 F.2d 219 (D.C.Cir. 1962) and contend that it is conclusive on this issue. With this we disagree. Hansford, like Krulewitch, dealt with the erroneous admission of evidence, namely, a policeman's testimony of prior criminal activity of the defendant. The policeman was the Government's rebuttal witness and testified at length, both on direct and cross-examination, about defendant's prior dealings in narcotics. The Court held the admission of all this testimony was prejudicial error as it was uncorroborated by a contemporaneous written report the policeman said he had made, nor was it otherwise substantially corroborated. In Hansford, the witness was specifically called to give the prejudicial testimony, whereas in the instant case, the objectionable statement was volunteered by the witness and was merely a slip of the tongue among many pages of testimony and is in no way analogous to the situation in Hansford. The Court, therefore, rejects this assignment as justifying a new trial.

■ Defendants complain that the instruction to disregard the evidence, while direct and certain, was not elaborated on. It was the opinion of the Court at that point, and is still the opinion of the Court, that having stricken the testimony completely from the case, any further elaboration would have merely aggravated the situation rather than correct it, since it involved only five lines of one page out of 160 pages of testimony of the Government's case. As a matter of fact, later in the testimony at page 108, the Court rebuked the Agent for apparently attempting to get into the testimony background information about the defendants, so there is no doubt in the Court's mind as to the efficacy of both instructions since the same Agent was involved in both instances.

■■ The fifth ground assigned is the refusal of the Court to withdraw a juror notwithstanding the disruption of the continuity of the trial because of the assassination of the President of the United States and its attending circumstances. This was a discretionary decision. In the light of the history of this case, the Court did not feel justified in withdrawing a juror and causing a fourth trial of the charges. The Court feels that the complaint that the jury would rationalize a traffic in narcotics with the assassination of a President of the United States, and that no one could get a fair trial in a United States Court where a Government Agent was involved in testimony relating to any crime, is completely illogical. Defendants, of course, can cite no cases but do point to historical accounts of alleged searching out of victims in the so-called "witch hunt" after the assassination of President Lincoln. Charges in those cases, however, stemmed directly from the assassination and had no bearing on an illegal sale of narcotics. The analogy is extremely nebulous, if it exists at all. The Court believes it does not.

The interruption in the trial did not destroy the continuity of the trial nor was it prejudicial to defendants. Many trials are interrupted by weekends and/or holidays and it cannot be said that each time this occurs, there is prejudice to one party or another. The Court was mindful of the interruption in the trial and sought to preserve continuity of the trial by having the Court Reporter re-

read the fifteen questions asked just before the recess, in order that the witness' testimony could be put in context. This was done to aid both the jury and defense counsel in pursuing their cross-examination. The decision to continue the trial was within the discretion of the Court and the Court does not find it abused that discretion.

█ The final point was that the Court erred in its instructions to the jury on the definition of the term "sale". The Court allowed the defendants an additional five days after argument in which to present a legal brief in support of their objection to the definition, but the defendants have written to the Court that they have no legal authority to offer and therefore the objection must be considered abandoned. This instruction was necessitated because of Points for Charge submitted by both defendants.

█ Another point attempted to be made at argument by counsel for Doctor Johnson was with reference to the "burden of proof". At the time of the discussion of the Points for Charge, out of hearing of the jury, the Court, influenced somewhat by the Points for Charge presented to Judge Kraft at the first trial, was under the impression that the defendants agreed that it was their obligation to establish entrapment by a fair preponderance of the evidence. In discussions relating to the Points, the Court stated it was of the opinion that this was probably a correct statement of law. However, the Court specifically warned both defendants' counsel that the Court would charge on the Points in its own words, and that if there was any objection with respect to any Point not covered, it would be the duty of defendants' counsel to bring the matter to the attention of the Court at the close of the Charge. In the intervening period, the Court made a decision that the Charge would contain no mention of any obligation on the part of the defendants to establish the defense of entrapment by any degree of proof. On the contrary, the Court instructed the jury that the burden of proof lay always with the Government, and that it was the Government's duty to prove the commission of the crime beyond a reasonable doubt *without entrapment;* that the burden was always on the Government to prove every element of each Count beyond a reasonable doubt before conviction could be had; that entrapment was a complete defense and if found, the jury should acquit the defendants. Further, that evidence of entrapment might be such as to raise a reasonable doubt as to defendants' guilt, and that they should be given advantage of any such doubt, if found, and acquitted. Actually, neither defendant Clarke nor defendant Johnson took any exceptions in this respect to the Charge as given, and properly, therefore, this matter is not before the Court. The only exception taken was to the definition of the term "sale", which has now been abandoned.

### Motions for Judgments of Acquittal

Each defendant assigns the following reasons in his motion for judgment of acquittal:

"1. The verdict is contrary to the evidence.

"2. The verdict is against the weight of the evidence.

"3. The verdict is contrary to law.

"4. The trial court erred in refusing to sustain the defendant's Motion for Judgment of Acquittal on the ground that entrapment was shown as a matter of law."

The real thrust of defendants' motions for judgments of acquittal is contained in the fourth assignment that entrapment was shown as a matter of law. This brings the matter into focus and requires an extended discussion of the evidence.

█ Defendants concede that the evidence must be accepted in the light most favorable to the Government's position. And considering it in that light, what are

the facts? Summarizing them, we find the following:

One Joseph Flores was a personal friend of both defendants for some time prior to the incidents here involved; he met them through his sister's husband who was connected with the theatre, and over a period of several years all three had visited back and forth in New York, Philadelphia, and Atlantic City. Flores came to Philadelphia two or three times a month and on most occasions, either talked to Doctor Clarke on the telephone, or personally called at his office. Flores was a bartender in charge of a restaurant with a liquor license on 125th Street in New York City. He had worked there from 1955 to the date of trial; and his hours were from six o'clock in the evening until four or five o'clock in the morning. Doctor Clarke often came to his place of business and they had dinner at different restaurants on different occasions. Flores also had a business license to sell merchandise, which license he said had been issued to him by the Clerk of the City of New York. By Agent Ripa of the Treasury Department, it was developed in the Government's case that he, Ripa, had as early as 1961 suspected Flores of being in the narcotics business and tried, through him, to get a source of narcotics. At this point, Agent Ripa pretended to be a narcotics peddler. Sometime in early 1961, February or March, Ripa came to Philadelphia with Flores and one Sonny LaForte, another narcotics peddler suspect, in an attempt to get a source of narcotics. A fair interpretation of the evidence is that the trip was only partially successful, the only narcotics secured at that time being two dolophine pills worth less than two cents which (but this is not entirely clear from the evidence) might have been obtained from Doctor Clarke. As a matter of fact, the testimony is completely cloudy and the only thing that Agent Ripa knew was that there was a doctor involved somewhere in North Philadelphia, whose name he did not know and was unable to find out. As to this particular episode, Flores testified positively that he had no part in the transaction and that he did not in any way subject Doctor Clarke, or anyone else, to exposure or attempt to persuade him to sell any narcotics. His mission was only to introduce LaForte to Doctor Clarke, and he apparently did nothing to involve Doctor Clarke in the narcotics business. Ripa testified that on this occasion, LaForte was the one with whom he did business.

The scene next moves to Atlantic City during the summer of 1961. Flores was vacationing at Bellmawr, New Jersey, and took a trip to Atlantic City where Doctors Clarke and Johnson were also vacationing, to see a show at the Club Harlem. On the porch of a hotel across the street, he met Doctors Clarke and Johnson and their wives, and in the course of conversation, Doctor Clarke took Flores aside and said that he had an idea of how they could make some money. There was no mention made of narcotics at this time. Flores testified he had no interest in this proposal and did not pursue it. Later in the year, probably in the fall of 1961, on a trip to Philadelphia, Doctor Clarke again broached the subject to Flores and this time stated that what he had in mind was traffic in narcotics, and asked Flores to find him "a connection". This was mentioned on several occasions, briefly or otherwise, during the course of the next few months when the two met. Flores stated flatly that he was not interested in any sale of narcotics, that he was never in the narcotics business, and did not want to become involved. However, Doctor Clarke pursued the subject.

Agent Ripa, in February of 1962, finding that he had been unable to persuade Flores to help him in his detection of narcotic distributors, came to the conclusion that Flores was giving him a runaround. He talked to Agent Cockerille, another Agent involved in this investigation, and they decided that they would reveal their true identity to Flores. Cockerille went to Flores' place of business, identified himself, and Flores and he repaired to a neighborhood restaurant

where Agent Cockerille asked him to help the Government. He asked Flores to call at the Bureau of Narcotics to be fingerprinted and photographed, and to become a special employee of the Treasury Department. Flores asked assurance that he would not be involved in any cases which might arise from his so acting, and upon receiving that assurance, did go to the Treasury Department, was fingerprinted and photographed, and thereafter agreed to help the Government. It took only one telephone call to Doctor Clarke to set up a meeting on March 15, 1962 with Doctor Clarke. Flores told Doctor Clarke, by telephone from New York, that he had made a contact who was interested in narcotics and was immediately invited to bring him to Philadelphia and to Doctor Clarke's office, which he did the same evening. He introduced Agent Ripa as "Johnny", a schoolmate of long acquaintance and a gentleman who was a knowledgeable narcotics pusher. From then on, Flores faded into the background.

Without hesitation, Doctor Clarke engaged in a thorough discussion with Ripa concerning the sale of narcotics. Doctor Clarke asked Agent Ripa how much narcotics he wanted to buy, whereupon Ripa asked Doctor Clarke what he had, to which Doctor Clarke replied that he could furnish him with cocaine and dolophine hydrochloride. Ripa stated he wanted only cocaine. Doctor Clarke then fixed the price of cocaine at $500.00 an ounce and the price of dolophine, a synthetic narcotic used for the relief of pain, at $500.00 for 1000 pills. Doctor Clarke told Agent Ripa that he could get him cocaine but that Ripa would also have to take the dolophine pills to take care of his customer addicts when they were short of cocaine. Agent Ripa finally agreed to take the dolophine, at which point Doctor Clarke placed a telephone call. Shortly thereafter, Doctor Johnson made his first appearance in the case.

Doctor Clarke introduced Doctor Johnson to Ripa as his partner and told Ripa it would be all right to talk in front of him. In further conversation with Ripa,

Doctors Clarke and Johnson both stated the price of the cocaine and dolophine, that the cocaine was of pure quality, indicating that it was the best cocaine that could be bought, and that it could be "cut" three or four times before it was resold. "Cut" was described as a term used in the narcotics trade as a synonym for "dilute". The Doctors then instructed Agent Ripa on the various ways of transporting the drugs after they had been transferred to him, such as carrying them in tobacco pouches or empty Empirin or Gelusil bottles in order to better conceal them.

At this point Doctor Johnson was called back to his office, but before leaving, Doctor Clarke asked him if he had any "C" available, to which Doctor Johnson replied that he had none at the time but could put his hands on some later. "C" was described as a term used in the narcotics trade to denote cocaine. Doctor Johnson then left for his office.

Doctor Clarke then sold 990 dolophine tablets to Agent Ripa, for which Agent Ripa paid him $400.00. Doctor Clarke poured the contents of the dolophine hydrochloride bottle into a cardboard box, put it in a paper bag and gave it to Ripa. Shortly thereafter Doctor Johnson returned and further conversation was had concerning the cocaine which Doctor Johnson had said he could get later. Doctor Johnson then invited all of them to dinner at his home in Elkins Park, a suburb of Philadelphia, which invitation was accepted and they repaired to Doctor Johnson's home.

At his home, Doctor Johnson took Flores and Ripa into a small office at the side of the house, opened a locked metal desk, and removed four small quarter-ounce brown bottles which were sealed and had the labels of "cocaine hydrochloride" on them. Ripa explained that he had given all his money to Doctor Clarke and did not have money to purchase the cocaine, upon which Doctor Johnson remarked that he didn't like the idea of Doctor Clarke's doing business behind his back. He did agree, however, to let him take a quarter-ounce bottle of

cocaine. Doctor Johnson thereupon opened the seal of the cocaine bottle, poured its contents into a Gelusil bottle and gave it to Agent Ripa. After dinner Agent Ripa and Flores left the Johnson home and drove Doctor Clarke home. At this time Doctor Clarke told Agent Ripa to get in touch with him the following week, at which time he could have an ounce of cocaine and 2000 dolophine tablets.

On March 22 Flores called Doctor Clarke and told him he was sending "Johnny" down but that he would not come along. Doctor Clarke insisted that Flores accompany him. They came to Philadelphia and met Doctor Clarke, but this time Agent Cockerille was present and was introduced to Doctor Clarke by Agent Ripa as "Jimmy", his runner, pusher, associate. He told Doctor Clarke that Cockerille was the man who transported any drugs that he purchased to Tampa, Florida, where they were distributed. Doctor Johnson at this point walked in and Doctor Clarke introduced Cockerille to Doctor Johnson. There was discussion about the sample of cocaine given to Ripa by Johnson, Ripa explaining that it was very good. However, he told Doctor Clarke that there was a shortage of 86 dolophine tablets, since the count demonstrated 904 rather than 990. Doctor Clarke told Ripa he wouldn't be hurt by the shortage and then asked Cockerille and Ripa to walk into the back room. Doctor Clarke took from a cabinet two bottles which had the labels of "cocaine hydrochloride" on them and two large brown colored bottles which had the labels "dolophine hydrochloride". Doctor Clarke instructed Agent Cockerille to remove the contents of the cocaine hydrochloride bottles and place them into a woman's diaphragm kit container which Doctor Clarke furnished. Doctor Clarke poured the contents of the two dolophine bottles into a cardboard box. They returned to the front office and they were placed in a paper bag and given to Cockerille. Doctor Johnson, who had left, returned shortly with a quarter-ounce bottle of cocaine. Again they went into the back

room. Johnson had Cockerille pour the contents of the bottle into the diaphragm kit container with the other cocaine, and Doctor Clarke told them that he could let them have an additional two quarter-ounce bottles of cocaine if Ripa had the money. Ripa said he was interested and Doctor Clarke told him that he would have to pay for the remainder of the cocaine which Doctor Johnson had given on March 15, to which Ripa agreed and Doctor Johnson removed the two bottles and poured the two quarter-ounce bottles of cocaine into the diaphragm kit container. The total involved an ounce and a quarter of cocaine and 2000 dolophine tablets for which Ripa paid the doctors $2,000.00.

In a further discussion, Doctor Clarke asked Ripa whether he would be interested in going into partnership with him and Doctor Johnson in a clinic through which he could purchase six to seven more ounces of cocaine per week that Ripa could sell. Doctor Clarke said $10,000.00 in cash would be needed to initiate this venture from which they could make one million dollars. Ripa said he would have to talk to his principals and could not give a commitment. There was further discussion of the method of concealing the narcotics, and both Doctors Clarke and Johnson stated it might be wise to utilize cities such as Trenton and other nearby towns, or quite possibly, they could come and meet them in New York. Flores and the Agents were then taken to the railroad station and had some difficulty in eluding the physicians in order to take their purchases to the Narcotics Bureau in Philadelphia.

The next meeting, in conformity with the suggestion of Doctors Clarke and Johnson, was in New York on March 28, at Dante's Lounge, at 160th Street and Broadway. Although the place was suggested by Flores, all transactions were conducted between Agents Ripa and Cockerille and Doctors Clarke and Johnson. The first transaction on this occasion was with Doctor Clarke and involved cocaine and dolophine tablets. Ripa complained of a shortage of a quarter-ounce of cocaine on the previous transaction.

Cockerille and Doctor Clarke went to Clarke's car and the narcotics were exchanged. Cockerille returned and told Ripa to pay him and Ripa paid $1250.00 to Doctor Clarke. Doctor Clarke asked Ripa whether he had any news concerning the proposed clinic which had been mentioned at the prior meeting. Ripa informed him that he was still in the process of discussing it with his people and that he would let him know. Doctor Johnson later came and as a result of the transactions, again conducted from the trunk of Doctor Johnson's car, the narcotics were exchanged and eventually Ripa paid Johnson $750.00 and made arrangements to meet a week later when the two doctors stated they would have more cocaine and dolophine tablets.

The next meeting was in Philadelphia on April 4, 1962. This time only the two Agents came to Philadelphia. They went to Doctor Clarke's office and he asked them to go to the office of Doctor Johnson and wait and shortly afterwards Doctor Clarke arrived. He was carrying a paper bag in which he had cocaine, dolophine tablets, and a woman's diaphragm kit container. This transfer involved $1500.00 given to Doctor Clarke. When Doctor Johnson walked in, Doctor Clarke stated he had 2000 more dolophine tablets if they were interested. Doctor Johnson stated he had not received his order forms for cocaine, that he was waiting for them, and if they waited, they still might get the forms and he could pick up the cocaine. Doctor Johnson then demonstrated means of cleaning bottles for the transportation of cocaine and dolophine tablets and discussed future purchases of narcotics. Doctor Clarke then reappeared with two more large bottles of dolophine hydrochloride and Ripa stated he didn't have enough money; that he had only enough money for one and Clarke then poured the contents of one bottle into the cardboard container which he had previously given to Cockerille. Ripa pulled out $500.00 which Clarke told him to pay to Johnson, which was done.

The next meeting was April 11 in Philadelphia. The two Agents proceeded to the office of Doctor Clarke, were joined by Doctor Johnson, and a discussion was had about future deliveries of narcotics. At that time, Ripa negotiated for two ounces of cocaine and 4000 dolophine tablets. Doctor Clarke asked the two Agents to go into the back room again, where he removed from the original cocaine containers eight brown bottles, and poured the contents into a diaphragm container, and the dolophine tablets into a cardboard box. Ripa counted out $2500.00 and gave it to Doctor Clarke, explaining he was $500.00 short but that he had more money out in the car and would send Agent Cockerille out to get it. Doctor Clarke then took $1500.00 from the $2500.00 and gave it to Doctor Johnson, saying they were now all square. Cockerille then left, apparently to get the $500.00 but returned shortly after with other Agents, arrest warrants, search warrants, and placed Doctors Clarke and Johnson under arrest. The money previously paid was confiscated.

Neither defendant attempted to deny any of the incidents above outlined. As a matter of fact, a stipulation entered of record and read as part of the Charge, admitted each and every of the transactions above outlined. Each defendant took the stand in his own behalf and stated the following: They were both in serious financial difficulties in 1961 and 1962; that Flores, their friend of long standing, had, for a period of upwards of two years, been attempting to persuade them to secure narcotics for him; that they had withstood his persuasive suggestions and entreaties and had withstood all of the pressures which he had applied to them for more than a year; that finally, because of financial pressures, they had succumbed; that the idea of selling narcotics had originated not with them but with Flores. However, on cross-examination, their story was considerably weakened. Doctor Clarke's gross income for 1961 and years prior thereto averaged about $24,000.00.

He drove a Ford Thunderbird automobile. Doctor Johnson averred that his gross income was only $8,000.00 a year, but he drove a Cadillac automobile and had a home in the suburbs with a swimming pool, which he testified he had himself built. Doctor Clarke readily admitted that the cocaine which he sold at $500.00 per ounce cost him approximately $80.00, and the dolophine tablets which he sold per thousand for $500.00 cost him only $5.95 per thousand. Doctor Johnson also produced evidence of good character and there is no exception to the Charge of the Court in that regard.

The evidence given by Flores and defendants, Clarke and Johnson, was diametrically opposed. Flores emphatically denied that he was ever in the narcotics business, denied that he had first broached the subject to Doctor Clarke, and, in fact, was amazed on March 15 of 1962 when Doctor Johnson appeared in the picture. The only one with whom he had had any discussions up to that time was Doctor Clarke and he did not know of Doctor Johnson's involvement until Clarke introduced Johnson to Ripa as his partner.

■ The appearance of these three men on the stand posed a rather remarkable contrast. Here were two well-educated professional men of apparent standing in the community against whose testimony was the testimony of a manager of a restaurant with a liquor license, who had only a junior high school education. The jury could have found many inconsistencies between the testimony of the defendants and Flores. They could also have found, and it is clear that the jury did find, that the story of Flores was straightforward and consistent with the totality of facts developed at the trial, as opposed to the testimony of the defendants picturing themselves as victims of persecution. Doctor Clarke invited the opportunity to engage in a lucrative narcotics business for profit. That such an opportunity was given to him by a special employee of the Government, and which opportunity he eagerly seized, certainly does not constitute entrapment. It is significant also that all negotiations and transactions were had directly between the Agents and the Doctors; that the thousands of dollars profit involved went to the Doctors, and there was not the slightest evidence that Flores was to profit by a single penny from these transactions.

■ The defendants' fourth reason that the defense of entrapment was established as a matter of law, and that the Court erred in allowing the issue of entrapment to be decided by the jury, is, in the light of the foregoing recitation of facts, not well-founded.

Both the defendants and the United States, in their respective briefs, cite the now famous case of Sorrels v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L. Ed. 413 (1932), which indeed must be the starting point of any discussion of the defense of entrapment. In United States v. Roett, 172 F.2d 379, at pages 380, 381 (3 Cir. 1949), Chief Judge Biggs set out the "guiding principle" of the Sorrels case as follows:

"As stated by Mr. Chief Justice Hughes, Id., 287 U.S. at pages 441, 442, 53 S.Ct. at page 212, 77 L.Ed. 413: 'It is well settled that the fact that officers or employees of the government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises. * * * The appropriate object of this permitted activity, frequently essential to the enforcement of the law, is to reveal the criminal design; to expose the illicit traffic, the prohibited publication, the fraudulent use of the mails, the illegal conspiracy, or other offenses, and thus to disclose the would-be violators of the law. *A different question is presented when the criminal design originates with the officials of the Government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its*

*commission in order that they may prosecute.'*"

Defendants, although recognizing Sor-rels as they must, rely strongly on Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958), which is clearly distinguishable from the present case, since in Sherman, there was no question of credibility. However, certain language of Chief Justice Warren, speaking for the Court in Sherman, shows us the point from which we must start our inquiry in the present case. The Chief Justice, relying in part on Sorrels, supra, stated in Sherman, supra, 356 U.S. at 372, 78 S.Ct. at 820, 821, 2 L.Ed.2d 848:

> "However, the fact that government agents 'merely afford opportunities or facilities for the commission of the offense does not' constitute entrapment. Entrapment occurs only when the criminal conduct was 'the product of the *creative* activity' of law-enforcement officials. (Emphasis supplied.) See 287 U.S., at 441, 451 [53 S.Ct. at 212, 216, 77 L.Ed. 413]."

As Circuit Judge Staley pointed out in United States v. Santore, 270 F. 2d 949, 951 (3 Cir. 1959):

> "As noted in the Sherman opinion, the cases in the Courts of Appeals since Sorrels have unanimously concluded that unless it can be decided as a matter of law, the issue of whether a defendant has been entrapped is for the jury. This court has so held on a number of occasions. United States v. Klosterman, 3 Cir., 1957, 248 F.2d 191; United States v. Sawyer, 3 Cir., 1954, 210 F. 2d 169; United States v. Brandenburg, 3 Cir., 1947, 162 F.2d 980, certiorari denied 332 U.S. 769, 68 S. Ct. 80, 92 L.Ed. 354. The instant case falls squarely within that principle.

> "On the same day that Sherman was decided, the Supreme Court decided Masciale v. United States, 1958, 356 U.S. 386, 78 S.Ct. 827, 2 L.Ed.2d 859. In that case, as in

this, there was conflicting evidence on the issue of entrapment, and the district court submitted the issue to the jury. The Supreme Court upheld this action."

Subsequent to Santore, in Simmons v. United States, 302 F.2d 71, at page 79 (3 Cir. 1962), Circuit Judge Forman had occasion to discuss Sherman and stated:

> "In Sherman, the appellant submits that the Court held that the *undisputed* testimony of the prosecution's witnesses established entrapment as a matter of law and that this is analogous to the instant case. Granting that Sherman so held, the analogy claimed by appellant fails for the reason that the prosecution's witnesses in the instant case made out a prima facie case against the appellant and his testimony disputing their evidence properly raised questions of fact for the jury's determination."

In light of the above cited authorities, the conflict in the testimony of Flores and the defendants as to who originated the illegal activity involved here presents a case which must be determined by a jury, due to the question of credibility.

At the trial this Court was of the opinion that entrapment had not been proven as a matter of law. On reviewing the evidence in this case, this Court is constrained to say without any doubt whatsoever that not only was there no error in sending this case to the jury, but indeed it was the only way the case could be finally determined. The Court feels that if it had done otherwise, a great miscarriage of justice would have resulted.

The defendants further contend that the Government failed to sustain its burden of proving predisposition, relying on Whiting v. United States, 321 F.2d 72, at page 76 (1 Cir. 1963), particularly where the Court said:

> "We suggest, what we take to be in accord with Accardi v. United States, 5 Cir., 1958, 257 F.2d 168, cert. den. 358 U.S. 883, 79 S.Ct. 124,

3 L.Ed.2d 112, that once government inducement has been shown there are two issues. The government should establish that it engaged in no conduct that was shocking or offensive per se, and that the defendant was not, in fact, corrupted by the inducement."

Defendants' reliance on this case is not well-founded as the following passages from Whiting demonstrate. As to the Government's proving the defendant was not, in fact, corrupted by the inducement, the Court, 321 F.2d at page 76, stated:

"So far as the second aspect is concerned, it could not possibly be ruled that the present defendant must prevail. Although it may be inferred that he concluded so to do because of Peterson's (the Government agent) references to 'clubs' or to mutual acquaintances, *the defendant was the first to mention the subject of narcotics.* He was also the first to raise the question of personal use. His remarks were scarcely oblique. When Peterson, a person whose only credentials were the alleged mutual acquaintances, disclosed an interest in making a purchase, it could hardly be said that the defendant's immediate response was indicative of a weak will converted by government temptation. At best, this was a question of fact for the jury."

(Par. and emphasis supplied).

The foregoing is particularly fitting to the present case in that it was Doctor Clarke who first mentioned narcotics, and that on his first meeting with Agent Ripa, an illegal sale was consummated.

The defendant, in Whiting, then urged 321 F.2d at page 76: " * * * that it is per se *improper* conduct to offer inducement, as on the present record was done here, without prior good reason to suspect guilt", to which the Court replied 321 F.2d at page 77: " * * * we hold that it is not per se offensive conduct for the government to initiate inducement without a showing of probable cause." One reason for this holding was that evidence necessary to prove probable cause might prejudice the defendant in the eyes of the jury on the issue of whether or not he was corrupted by the inducement. This is very pertinent to the present case when the cause for the mistrial at the second trial is recalled. The Court, therefore, concludes that the Whiting case adds nothing in support of the defendants' position; if anything, it weakens it.

The defendants' final contention concerning the Government's failure to prove predisposition is contained in their brief at page 5 where they assert, "There was not the slightest admissible evidence of predisposition on the part of the defendants." This statement flies in face of the Government's evidence and has no basis in fact. The testimony of Flores that Doctor Clarke first raised the question of narcotics, as well as Agent Ripa's testimony that at the first meeting both defendants fixed the price of the narcotics, vouched for its quality, discussed methods of transporting it and future meetings for subsequent sales, certainly shows predisposition. Also, it must be recalled that Flores testified that he was unaware of Doctor Johnson's involvement until the night of March 15, 1962, the same night that Doctor Johnson participated in the above related discussions, as well as giving Agent Ripa a sample of cocaine after having invited him home to dinner.

In United States v. Sawyer, 210 F.2d 169, at page 170 (3 Cir. 1954), Circuit Judge Hastie stated:

"But even so, there could be no entrapment if the defendant was already disposed to such wrongdoing, awaiting only an advantageous and apparently safe opportunity. Such disposition or its absence may be evidenced in various ways, including response to the particular request and, in some situations, by a revealing recent course of conduct or activity."

The last mentioned activity on March 15, 1962 certainly shows this disposi-

660

tion. Further support for this is found in United States v. Orza, 320 F.2d 574, at pages 575, 576 (2 Cir. 1963), where in deciding that the issue of entrapment was properly submitted to a jury, the Court stated:

"This question was for the jury, see Masciale v. United States, supra, 356 U.S. at p. 388, 78 S.Ct. at pp. 828–829, 2 L.Ed.2d 859, which could properly have found against the defendant on the basis of the size of the sale, the defendant's willingness to make it, his representations as to the quality of the narcotics, the ease with which he was able to make almost immediate delivery, and his stated willingness to make future sales."

 The defendants seemed to have forgotten that the jury was free to disregard the defendants' evidence in this case. Whiting v. United States, supra, 321 F.2d at page 74.

Another leading case which firmly supports the Court in its actions in the present case, as well as bearing on the issue of showing predisposition, is Masciale v. United States, 356 U.S. 386, at page 388, 78 S.Ct. 827, at pages 828–829, 2 L.Ed.2d 859 (1958), in which neither party attempted to subpoena the Government informer, Kowel, but the Court stated:

"In this case entrapment could have occurred in only one of two ways. Either Marshall (Ripa) induced petitioner, or Kowel (Flores) did. As for Marshall (Ripa), petitioner has conceded here that the jury could have found that when petitioner met Marshall (Ripa) he was ready and willing to search out a source of narcotics and to bring about a sale. As for Kowel (Flores), petitioner testified that the informer engaged in a campaign to persuade him to sell narcotics by using the lure of easy income. Petitioner argues that this undisputed testimony explained why he was willing to deal with Marshall (Ripa) and so established entrapment as a matter of law. However, his testimony alone could

not have this effect. While petitioner presented enough evidence for the jury to consider, they were entitled to disbelieve him in regard to Kowel (Flores) and so find for the Government on the issue of guilt. Therefore, the trial court properly submitted the case to the jury." (Par. supplied).

 At the argument, defendants asserted that the failure of the Government to arrest defendants after the initial sale was further evidence of entrapment. The gist of the argument was that by allowing the illegal activity to continue, the Government was encouraging crime. Dispositive of this contention is the following from United States v. Sizer, 292 F.2d 596, 599 (4 Cir. 1961):

"Also without merit is the appellant's contention that he should have been arrested immediately upon the first sale and not given the opportunity to make additional sales. The arrest was not unduly delayed, and it was not improper for the officers to see how far Sizer was prepared to go in his illegal conduct, and to discover, as they did, the source of his supply. See Dailey v. United States, 5 Cir., 1958, 261 F.2d 870, certiorari denied, 359 U.S. 969, 79 S.Ct. 881, 3 L.Ed.2d 836."

In the present case, the arrest was not unduly delayed since less than a month elapsed between the first sale and the arrest. By the continuing investigation in this case, the Agents got some idea as to how far the defendants were willing to go in their illicit narcotics scheme as is witnessed by the increasing volume of business transacted at the successive meetings, as well as defendants' plan for opening the clinic to increase their supply. It was also important for the investigation to continue so that it could be determined whether or not others were involved with the defendants in this sordid business.

In holding that the continuing investigation in this case was completely justified and proper, consideration was given

to the nature of the offense involved. The illicit traffic in narcotics, by its nature, is cancer-like in that it feeds on itself and infects everything it touches, spawning a multitude of other crimes. Once such a nefarious operation is suspected or discovered, it is the duty of Government Agents to ascertain fully the extent of any defendant's involvement, as well as to make sure that all concerned are apprehended. The necessity for a full and complete investigation was obvious and it was carried out in this case with complete propriety.

The motions will be denied.