**UNITED STATES ex rel. HASSEL v. MATHUES, U. S. Marshal.**

District Court, E. D. Pennsylvania. December 15, 1927.

No. M–120.

**Criminal law ⬠⟹37—Charge of bribery against relator held result of illegal entrapment.**

Relator and his brother conducted a brewery. Two prohibition agents were sent to watch the brewery, and the brother approached them with offer of a bribe. They signified their willingness to accept, but sent the brother for relator, and in his presence bribe money was paid, and he was charged as a participant in the offense. There was no evidence that he previously had any connection with the matter. *Held,* that he was the victim of an illegal entrapment.

Habeas Corpus. Petition by the United States, on the relation of Max Hassel against W. Frank Mathues, United States Marshal, for writ of habeas corpus. Writ granted.

George W. Coles, U. S. Atty., of Philadelphia, Pa., for relator.

Wm. T. Connor and John R. K. Scott, both of Philadelphia, Pa., for defendant.

THOMPSON, District Judge. The relator, with one Morris Hassel, his brother, was taken before a United States commissioner upon a charge of bribery of two officers of the Prohibition Bureau. From a transcript of the evidence taken before the commissioner, it appears that Prohibition Agent Hurley and Prohibition Inspector Kirstetter had been assigned to watch the Fisher Brewery at Reading, Pa., conducted by Morris Hassel and Max Hassel, the relator, and to detect violations by them of the Prohibition Law. Upon arriving there on August 26, 1927, late in the evening, they proceeded to the brewery, where they were approached by Morris Hassel and an unknown man. Morris Hassel, having learned from them that the purpose of their presence was to watch the brewery, met them again on August 30 at night, and invited Hurley to get into his car and ride over a hill. The invitation was accepted, Kirstetter remaining at the gate of the brewery. Morris Hassel, while they were riding in his car with no others present, offered Hurley $500 for "good will." Hurley told Hassel that he would have to talk about it to Kirstetter, and refused to take the money at that time. When the matter was broached to Kirstetter, he said that, if it was agreeable to Hurley, it was agreeable to him. Hurley then told Morris Hassel that he did not want to talk to him; he wanted to talk to Max Hassel. This conversation was reported to Mr. Macphee, their superior in Philadelphia, who told them to go back to Reading and take anything that was offered to them.

On the following night, August 31, Hurley and Kirstetter met Morris Hassel and Max Hassel in front of the Fisher Brewery, and the two Hassels agreed to give the two prohibition officers $1,000 for being allowed to ship out two carloads of beer. Hurley and Kirstetter told them it was worth $1,500 for their reputations to let them ship out the beer, whereupon Max Hassel agreed to "split the difference" and give them $1,250. In accordance with the arrangements made at that time, Hurley and Kirstetter drove in their car to a designated place that night. While waiting there, an automobile was driven up, and, in the darkness, they were handed a bag containing pears and $1,250. On the night of September 1, they met the two Hassels and sat with them in their Lincoln sedan, and it was agreed that the two Hassels give them $4 a barrel for two carloads of beer, which were to be shipped at 5 o'clock the next morning. Morris Hassel got out of the car, opened up his pocketbook, stepped back into the car, where he had a conversation with Max Hassel, and then handed $800 to Hurley, who was sitting on the rear seat.

The commissioner, deeming the evidence sufficient to make out a prima facie case, held both the defendants in bail to await the action of the grand jury. Max Hassel, having been surrendered by his bondsman, obtained a writ of habeas corpus. It is contended by his attorney that, upon the state of the evidence before the commissioner, it clearly appeared that the relator was entrapped into the commission of the offense and should be discharged. There is no evidence to establish the fact that there was any thought in Max Hassel's mind of offering a bribe to the prohibition officers until Agent Hurley, after suggestion of bribery made by Morris Hassel, had made the latter his agent to bring Max Hassel to the officers and have him take part in the plans for bribery.

It is against the public policy to sustain a conviction for crime where the party is induced to commit it by officers of the government, who thereafter ensnare and apprehend him in such commission. Sam Yick v. United States (C. C. A.) 240 F. 60. United States v. Whittier, 28 Fed. Cas. 591, No. 16,688. While the first suggestion, looking toward the commission of the criminal act, was made by Morris Hassel to the officers, the suggestion which induced a criminal intent in Max Hassel originated with the officers, merely to entrap Max Hassel into the commission of a crime suggested to him by them through the

agency of his brother, Morris Hassel. There is a clear distinction to be observed between measures used to entrap a person in crime in order, by making him a criminal, to secure his conviction, and artifice used by officers in the performance of duty to detect crime in order that guilty persons may be prosecuted and convicted, to detect persons suspected of being engaged in criminal practices.

In the latter class of cases, the officers employed by the government to detect crime have the duty placed upon them of detecting criminal acts, and not of inciting them. Where one is engaged in an unlawful business, or it is suspected that he is so engaged, one engaged in the detection of such unlawful acts may obtain evidence by procuring the suspected person to commit the suspected offense by means of decoys, as, for example, by a letter requesting that there be sent to a fictitious address through the mails articles or things prohibited to be carried in the mails, Andrews v. United States, 162 U. S. 420, 16 S. Ct. 798, 40 L. Ed. 1023, Price v. United States, 165 U. S. 311, 17 S. Ct. 366, 41 L. Ed. 727; by procuring one suspected of being a dealer in narcotic drugs to sell such drugs to one sent by the government agent, United States v. Pappagoda (D. C.) 288 F. 214; by associating with those engaged in a criminal conspiracy under a fictitious name and in disguise, so as to keep watch upon the conspirators and gain information as to their unlawful purpose and acts, Campbell v. Commonwealth, 84 Pa. 187.

There is, however, a broad distinction between cases of that sort and a case where a government agent, whose duty it is to investigate and discover the commission of offenses connected with an unlawful business in which a person is engaged, or is suspected of being engaged, reveals himself as a representative of a bureau or department having charge of investigating and obtaining evidence concerning an unlawful business, and offers himself as a participator in a different offense not connected with the business under investigation. If, as in the instant case, the investigator induces the commission of an offense not an essential part of the business of manufacturing and selling intoxicating liquor unlawfully, but a crime to which he himself must be a party, and, under the evidence, there has been no intention on the part of the entrapped to commit such an offense until he was lured into it, the policy of the law will not permit a prosecution based on such entrapment to be carried on.

It follows, therefore, that the relator must be discharged; and it is so ordered.