## UNITED STATES of America
### v.
### Frederick W. KLOSTERMAN.

## UNITED STATES
### v.
### John R. DEENEY, Jr.

## UNITED STATES
### v.
### Joseph A. STAFFORD.
### Nos. 12190–12192.

United States Court of Appeals
Third Circuit.

Argued June 10, 1957.

Decided Sept. 9, 1957.

Lester J. Schaffer, Philadelphia, Pa. (William A. Gray, Philadelphia, Pa., on the brief), for Frederick W. Klosterman.

Angelo D. Malandra, Camden, N. J., on the brief, for John R. Deeney, Jr., and Joseph A. Stafford.

Warren D. Mulloy, Asst. U. S. Atty., Philadelphia, Pa. (G. Clinton Fogwell, Jr., U. S. Atty., Philadelphia, Pa., on the brief), for appellee.

Before MARIS, KÁLODNER and STALEY, Circuit Judges.

STALEY, Circuit Judge.

These criminal appeals involve the defense of entrapment and present for our consideration the issue of whether the criminal intent proceeded from government agents or whether these agents simply afforded opportunities to those already disposed to the alleged criminality.

Appellants Deeney, Stafford, and Klosterman were indicted on January 26, 1956, on two counts. The first count charged that the three appellants conspired in violation of 18 U.S.C. § 371(1) to defraud the United States, and (2) to commit the offense of bribery in violation of 18 U.S.C. § 201. The second count charged the three appellants, with the substantive offense of bribery. Appellant Deeney, a special agent of the Internal Revenue Service, was separately indicted on the charge of conspiring with Klosterman and Stafford, not named as defendants, to defraud the United States in violation of the Internal Revenue Code, 26 U.S.C. § 7214(a) (4).

After the trial in which defendants presented no evidence, the jury found all defendants guilty as charged, with the exception of Klosterman who was acquitted on the conspiracy count alone.

Upon consideration of defense motions for acquittal, the district court granted the motions on the conspiracy conviction of Deeney and Stafford and the conspiracy conviction against Deeney in the separate indictment. The substantive bribery conviction of each of the defendants was sustained. D.C.E.D.Pa.1957, 147 F.Supp. 843. These appeals were taken from the subsequent judgments and sentences.

Appellants' main contention is that the following factual situation compels the finding of entrapment as a matter of law, and thus necessitates the reversal of their convictions. The government's principal witness was J. J. King, a special agent of the Internal Revenue Service. King testified upon direct examination that he had been assigned in 1953 the investigation of the tax return of appellant Klosterman for the years 1948 through 1952, and that in August of 1955 the investigation had not yet been concluded.[1] Appellant Deeney was also a special agent of the Internal Revenue Service; King had known Deeney for three years and at the date of the trial had worked with him for two years. King testified that on August 24, 1955, Deeney approached him in the Camden office of the Internal Revenue Service and inquired about the progress of the Klosterman case. According to King, Deeney stated that a friend of his in the insurance business, later identified as Stafford, apparently handled Klosterman's insurance, and that this insurance man reported that Klosterman said he would be willing to pay King ten or twenty thousand dollars to have his tax case settled. King suggested to Deeney that the incident be reported to their superior, DiMaggio. Deeney said he would rather not because of the possibility of implicating his friend in the insurance business. King testified that he told Deeney to forget about it. On the next day, August 25, 1955, King related the incident to DiMaggio, and was thereupon directed to report to the Inspection Service in Philadelphia. The following day King asked Deeney if he had seen the insurance man, and Deeney replied, in King's words, "Yes, I saw him and I told him to stay away from me; that I don't want any part of this whole deal." About a week later, King met with DiMaggio and Inspectors Sweeney and Curren of the Inspection Service. King was instructed to seek out more information from Deeney, to find out who the insurance man was, and then to make an arrangement to meet Klosterman so that King might accept the supposed bribe and thus complete the trap. Pursuant to these instructions and after a Minifon recorder had been attached to his person, King telephoned Deeney and requested that he meet him so that they might talk. After Deeney arrived at the designated place, King began the conversation by asking Deeney more about the Klosterman deal. Deeney replied that the ceiling for settlement was now $50,000, and that he, Deeney, could arrange a meeting with the insurance agent. Subsequently, King inquired of Deeney about ten or eleven times whether he had arranged a meeting with the insurance agent, and on each occasion Deeney replied that he had not. On one such occasion, September 20, 1955, after King had inquired whether Deeney had contacted the insurance man, Deeney replied that he had, and the insurance agent did not want anything to do with the scheme. Deeney added, "Besides that, we should consider our own positions. We are both making pretty good salaries and we would only be jeopardizing our positions if we went for this deal." King testified as to the remainder of the conversation in this manner: "And he also said that if we did go for this deal, why, thereafter any gambler or racketeer in that area would have us in the palm of their hands, so to speak * * *. And I agreed with him and told him we had better forget

---

1. There was evidence that Klosterman's returns were under investigation by at least four different agents during the period of 1947 through 1951, before the case was assigned to King in 1953.

about the whole thing. That conversation ended there."

Notwithstanding Deeney's apparent effort to forget the matter, King nonetheless waited only one week and again asked Deeney to arrange a meeting with the insurance man. Deeney replied that he would see what he could do.

Several weeks passed without word from Deeney. Then on October 19, 1955, in the presence and at the direction of Inspector Sweeney and DiMaggio, King telephoned Deeney at Deeney's home and said that he had to meet the insurance man that night and added, "This whole deal has been tearing me apart and I want to know what it is all about."

Finally, Deeney yielded and arranged a meeting that night with Stafford, the insurance man. At this meeting, the conversation indicated that Stafford was aware of the financial arrangements involved in the bribe, evidencing the fact that he had conversed with Deeney on that subject. King then suggested a meeting with Klosterman at Camden, but Stafford said that Klosterman was too well known there. King then suggested a meeting with Klosterman at a Philadelphia hotel on October 21, 1955.

At the Philadelphia meeting, Klosterman gave to King $5,000 in cash. At a pre-arranged signal, Curren and Sweeney arrested Klosterman.

■ Sorrells v. United States, 1932, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413, is the foundation upon which is built the superstructure of entrapment law in the federal courts. There the Supreme Court said, 287 U.S. at pages 441, 442, 53 S.Ct. at page 212:

"It is well settled that the fact that officers or employees of the government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises. [Citing cases.] The appropriate object of this permitted activity, frequently essential to the enforcement of the law, is to reveal the criminal design * * *. A different question is presented when the criminal design originates with the officials of the government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute."

The Court went on to cite Butts v. United States, 8 Cir., 1921, 273 F. 35, 38, 18 A.L.R. 143, to the effect that it is unconscionable and contrary to public policy to punish a man for a crime he evidently would never have committed were he not inspired, incited, and persuaded by officials of the law. The Court decided that under such circumstances no crime was committed, for Congress could not have intended that an act within the literal meaning of a criminal statute would be a crime if incited by those whose purpose it is to prevent crime. Traps and decoys are sometimes permitted. "The predisposition and criminal designs of the defendant are relevant." 287 U.S. at page 451, 53 S.Ct. at page 216.

The decisions of this court which predate the Sorrells case expressed views consistent with it. Luterman v. United States, 3 Cir., 281 F. 374, certiorari denied, 1922, 260 U.S. 732, 43 S.Ct. 94, 67 L.Ed. 486; Zucker v. United States, 3 Cir., 288 F. 12, certiorari denied, 1923, 262 U.S. 756, 43 S.Ct. 703, 67 L.Ed. 1218; Rosso v. United States, 3 Cir., 1924, 1 F.2d 717. And our decisions after Sorrells have fully recognized and followed the principles of that case. United States v. Brandenburg, 3 Cir., 162 F.2d 980, certiorari denied, 1947, 332 U.S. 769, 68 S.Ct. 80, 92 L.Ed. 354; United States v. Roett, 3 Cir., 172 F.2d 379, certiorari denied, 1949, 336 U.S. 960, 69 S.Ct. 889, 93 L.Ed. 1112; United States v. Sawyer, 3 Cir., 1954, 210 F.2d 169; United States v. Moses, 3 Cir., 1955, 220 F.2d 166.

■ The government urges that entrapment is almost always a jury question, and since the jury resolved the

question against the defendants, there should be an affirmance. While it is true that under normal circumstances entrapment is usually a jury question, where the evidence points to only one conclusion the question may be decided as a matter of law, just as any other factual issue admitting of only one conclusion. Cline v. United States, 8 Cir., 1927, 20 F.2d 494; Morei v. United States, 6 Cir., 1942, 127 F.2d 827, 835; United States ex rel. Hassel v. Mathues, D.C. E.D.Pa.1927, 22 F.2d 979. See also United States v. Moses, 3 Cir., 220 F.2d at page 169.

■ Appellant Deeney argues that he was entrapped as a matter of law into committing the crime of bribery. Was Deeney a man otherwise innocent who would not have committed a crime but for official solicitation, or was he predisposed to pursue a criminal design which he had already conceived? The record is clear that Deeney made the first approach to King about the scheme on August 24, 1955. Deeney urges, however, that he had abandoned the scheme, and was lured back into it by King's entrapping solicitations. It is true that on August 26, 1955, Deeney apparently abandoned the plan, but his recorded conversation with King a week later indicates that he had continued to consider it. The record then discloses a change of mind in Deeney. In the month of September and until October 19, 1955, King inquired of Deeney ten or eleven times whether he had arranged a meeting with Stafford, and Deeney replied on all occasions that he had not. On one occasion he urged King to consider their own positions and that it would be better for both to forget the scheme. King admitted on cross-examination that on at least three occasions Deeney wanted out of the scheme. Nonetheless, pursuant to the plan devised by his superior and Inspectors Sweeney and Curren, King relentlessly pursued Deeney until Deeney finally yielded on October 19, 1955, and agreed to arrange a meeting for King with Stafford.

In this framework of fact, we are asked to determine the origin of the criminal intent. Whether the design is the product of official activity or of the defendant's mind is often disclosed by the amount of persuasion needed on the part of the government agent to move the defendant to the criminal conduct. Another way of stating this rule is to say that the criminal disposition of the defendant is often revealed by his response to the requests of the government agent. United States v. Sawyer, 3 Cir., 210 F.2d at page 170.

The inordinate amount of persuasion of Deeney by King indicates two elements in this case. It clearly discloses that Deeney was sincere in his attempt to abandon his original plan. It shows also that the criminal design and intent for the commission of the actual bribery originated not with him but rather with the government agents who engineered the persuasion and solicitation.

The initial approach of Deeney to King might have been a criminal act, but that question is not now before us. The overzealous tactics of the law-enforcement agents in creating a criminal out of a man who had abandoned his criminal intent are before us, and we condemn them strongly. We are compelled to conclude that as to Deeney there was entrapment as a matter of law, since the record will not admit of another conclusion. His conviction will be reversed.

■ In discussing the convictions of Stafford and Klosterman, it must be borne in mind that they, as well as Deeney, were acquitted of the conspiracy charges, and so it follows that nothing which Deeney told King could apply against Stafford or Klosterman.

■ The admissible evidence in the record as to Stafford, then, discloses only that he met with King, as a result of the persuasion of Deeney by King. His knowledge of the financial arrangements involved in the criminal plan indicates that he talked to Deeney about them.

Deeney became King's agent for the purpose of entrapping Stafford. United States ex rel. Hassel v. Mathues, D.C. E.D.Pa.1927, 22 F.2d 979. In order that the solicitations directed toward Stafford be within the sphere of proper law enforcement, the government must show a predisposition and criminal design on Stafford's part. Sorrells v. United States, 287 U.S at page 451, 53 S.Ct. at page 216. This record is devoid of admissible evidence that would indicate to government agents that before they conceived of the plan of persuasion through King, Stafford was other than an innocent man. No previous criminal record was shown and no reputation evidence was introduced to that end. It is our view that in a crime of this nature, occurring as it does usually only once and not in a series, is not like the sale of narcotics or of contraband liquor, so it is virtually impossible to show a course of conduct. Thus, Deeney, the entrapped victim of the government scheme, in turn entraps Stafford, an innocent person. We do not think that the degree of persuasion is significant where the first approach is made by the agent of the law to an apparently innocent man. See dissent of Judge Frank in United States v. Masciale, 2 Cir., 1956, 236 F.2d 601, 604, certiorari granted, 1957, 352 U.S. 1000, 77 S.Ct. 568, 1 L.Ed.2d 545. Stafford's conviction will also be reversed.

What we have said about Stafford applies in large measure to appellant Klosterman also. But an added element in this case makes his conviction even more shocking to justice. His tax returns had been under investigation for an unusual length of time. During the period of investigation, Klosterman had numerous interviews with various agents and never once suggested an improper settlement of his tax liabilities. Thus, far from evidence of a predisposition to commit this crime, this case presents affirmative evidence to the contrary. The lengthy investigation of Klosterman's returns without a decision either to prosecute criminally or to seek civil remedies must certainly have had the effect of causing him at least some measure of anxiety. This subtle, although of course unintentional, conditioning of Klosterman would naturally have the effect of making him more susceptible to the persuasion of King through Deeney and Stafford. The government urges that Klosterman's presence in the hotel with King and his knowledge of the scheme indicate his predisposition to commit the crime. Were this true, the defense of entrapment would never prevail, since that defense must presuppose the commission of a crime. The fact that Klosterman was present in the hotel and did in fact bribe King indicates that he yielded to the lures and temptations devised by the agents of the government. Morei v. United States, 6 Cir., 127 F.2d at page 834. "Respect for law will not be advanced by resort, in its enforcement, to means which shock the common man's sense of decency and fair play." Dissent of Justice Brandeis in Burdeau v. McDowell, 1921, 256 U.S. 465, 477, 41 S.Ct. 574, 576, 65 L.Ed. 1048.

The judgments of conviction will be reversed and the cases remanded with directions to enter judgments of acquittal.