STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT-CROSS-APPELLANT, v. LAWRENCE N. STEIN, DEFENDANT-APPELLANT-CROSS-RESPONDENT.

Argued February 10, 1976—Decided June 11, 1976.

370

372

*Mr. Richard A. Levin* argued the cause for appellant-cross-respondent (*Messrs. Amster and Levin,* attorneys).

*Mr. Wilbur H. Mathesius,* Special Deputy Attorney General, argued the cause for respondent-cross-appellant (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

CONFORD, P. J. A. D., Temporarily Assigned. This appeal emanates from a petition for certification by defendant and a cross-petition by the State, both granted by the court, 68 *N. J.* 496 (1975), to review a judgment of the Appellate Division partly affirming and partly reversing a series of convictions of defendant arising from a number of connected occurrences. The trial was before a Law Division judge, sitting without a jury, largely based upon a stipulated record consisting of testimony taken on a preliminary motion to suppress certain statements, given to the Mercer County Prosecutor by defendant, and certain documents. The court filed a written opinion finding defendant guilty of all counts of the indictment.

The evidence adduced on the State's case indicates that defendant, a Trenton lawyer, suggested to a certain underworld figure that the house of one Dr. Gordon in Trenton was a likely target for a successful breaking and entering or burglary, as large amounts of cash were kept there. Defendant expected to share in the gains. As a result, there

was an armed robbery at that home about a year later. While attempting to evade the police, who had been alerted to the affair, the perpetrators abducted members of the family and injured two policemen. They were caught and arrested. Subsequently defendant was lured by the police into providing money for a purported but fictitious effort to release one of the arrestees on bail so that he might supposedly flee the country.

As a result of all of the foregoing defendant was indicted on counts of (a) conspiracy to steal currency; (b) armed robbery, assaults with an offensive weapon, kidnapping, kidnapping while armed and assaults upon a police officer; and (c) obstruction of justice and conspiracy to obstruct justice. Defendant was convicted on all counts and sentenced concurrently to terms of imprisonment aggregating 30 years to 30 years and one day.

The Appellate Division affirmed all the convictions except those for assault with an offensive weapon, kidnapping, kidnapping while armed, assault upon a police officer and obstruction of justice, those being set aside. In addition to affirming the other convictions, the appellate court also determined that while defendant could not be guilty of obstruction of justice on the evidence, he was guilty of an attempt to obstruct justice, and it entered a conviction thereof. One judge dissented in part, being of the view that the counts for obstruction of justice and conspiracy to obstruct justice should be vacated on grounds of entrapment.

Subject to amplified comment hereinafter, the factual background of this matter is adequately set out in the Appellate Division opinion as follows:

On March 17, 1972 Testa and Stasio, impersonating police officers, gained entrance to the Trenton home of Dr. Arnold Gordon. The pair produced pistols and demanded money and jewelry from Gordon. While Testa and Stasio obtained $470 from Gordon and bound him and his wife Edith, a maid telephoned the police. When the police arrived, the robbers took Edith and her 14 year old daughter Shelly from the house at gunpoint as hostages and attempted an escape at high speed in a getaway car. A chase ensued. Ultimately, the getaway car crashed into a police car barrier, seriously injuring

two police officers. The police arrested Testa and Stasio and freed Edith and Shelly. Bail was set at $250,000 for Testa and $100,000 for Stasio.

Subsequent investigation aroused the suspicions of the county prosecutor as to the possible involvement of others in the crime. Testa testified before the grand jury as follows: In September 1971 Joe Bradley introduced him to Pontani. Pontani gave Testa particulars about the layout of the Gordon home. Pontani wanted to be sure the children were not in the house at the time of the robbery. Pontani, Testa and Bradley met three times between September and October 18, 1971, the date of Bradley's death. Tassone was present on a few occasions. Testa stated that from the outset it was intended that the crime would be an armed robbery. Although burglary had been initially discussed, it was discarded as an impossibility. After Bradley's death, Pontani spoke to a lawyer who guaranteed the amount of money that would be in the house, the movements of the family and the layout of the telephone system. Pontani had indicated that the lawyer was "Jewish" and a close friend of the Gordons. Testa was present when Pontani telephoned the lawyer. The latter advised Pontani that $200,000 would be found in the house.

On May 9, 1973, after Testa testified, a plan of action was formulated by Assistant Prosecutor Farkas and various law enforcement personnel, including Detectives Moaba and Logan and Investigator Diszler, to determine the extent of the involvement of Stein and Pontani. Moaba called Pontani and, posing as Testa's friend, demanded that Pontani and his lawyer friend come up with $6,000 so that Testa could make bail and flee the country. Moaba stressed that Testa had not implicated Pontani or the lawyer. Pontani emphasized that he had not had any dealings with Testa and that he had given the information months earlier to Bradley.

On May 11, Moaba, still posing as a friend of Testa, again telephoned Pontani. Pontani stated that he had spoken with his lawyer friend, who said he was going to see what he could do. On May 15, Moaba, equipped with a body transmitter and recorder, met with Pontani at Pontani's home. Pontani indicated that his friend would come up with $5,000 within a week. Pontani told Moaba that he had nothing to do with Testa, that he had done business with Bradley and that Testa had used the information without informing Pontani. Moaba advised Pontani to "press" defendant for the money but Pontani said he had to be careful because this "guy's a legitimate stiff." Pontani told Moaba that a friend of his would visit Testa in jail on Saturday. The police relayed this information to Testa.

On May 18, Moaba called Pontani. Pontani arranged to meet Moaba with the money at a shopping center in Monmouth on May 21.

On Saturday May 19, the prosecutor's office conducted a photographic surveillance of the Mercer County Jail. A man identified

as Vincent Fiore, sent by Pontani, visited Testa and checked Moaba's story with him.

Surveillance of defendant was conducted on Monday, May 21. Stein carried a manila envelope to his office. He left his office and met Pontani at Stein's car. Pontani then entered Stein's office and exited with the envelope.

At noon, Moaba saw Pontani at the agreed upon location. Moaba identified himself as De Angelis from New York. Pontani advised Moaba that they would have to go to Trenton to get the money.

At 1:15 p.m. Moaba, posing as De Angelis, called Stein. He informed Stein that he had not received the money, that Pontani wanted him to follow him back to Trenton and that he thought "they're going to do the job on me." Stein said they would not and that he had given Pontani the money.

At 2:20 p.m. on May 21, Pontani was arrested and $5,000 was found on his person. He was jailed in lieu of $250,000 bail.

At 10 p.m. that day, Logan and Diszler spoke with Stein at his home. Logan told defendant that they were investigating Pontani and that the police had found $5,000 on his person. Defendant volunteered that he had given Pontani $5,000 in an envelope that very morning. He stated that he had helped out Pontani, a former client, in the past and that Pontani approached him for the money in order to help a friend. Logan stated that Pontani was in deep trouble and involved in a kidnapping and robbery. Stein expressed surprise. Logan asked Stein to come to the prosecutor's office the next day. Stein said that he had an appointment out of town the next day and would call Logan in the afternoon when he returned.

Prosecutor Bruce Schragger, who was personally acquainted with Stein, unsuccessfully attempted to meet him on the next day, May 22. Schragger wanted to give Stein the opportunity to explain his role in the matter.

At 3 p.m. on May 23, two criminal complaints against defendant were obtained from Judge Moore by Schragger and Diszler. One complaint charged Stein with aiding and abetting armed robbery and kidnapping, and conspiracy to commit armed robbery. The other charged him with obstruction of justice and conspiracy to obstruct justice in connection with the proposed flight of Testa from prosecution. Bail was fixed by the judge at $50,000. At the same time, complaints were also issued against Tassone, Farinella and Fioravanti, who were all arrested later in the afternoon. However, Schragger testified that he never had directed anyone to serve the complaints against Stein. He was hoping that Stein would make himself available for questioning. He wanted to have the complaints ready "in the event Mr. Stein continued to avoid our attempts."

At about 4 p.m. on the same day, May 23, Detective Toth telephoned Stein at a business establishment in Stroudsburg. Toth told Stein that Schragger wished to speak to him in his office at 9 a.m. the next day about the "Pontani matter." Stein agreed to be there. He immediately thereafter telephoned George Pelletieri, a Trenton

attorney, advised him that he had been asked to appear at the prosecutor's office and requested Pelletieri's assistance. Pelletieri agreed to accompany him. Stein was to meet him at his office prior to going to the prosecutor.

Stein called his wife from Stroudsburg and told her to be prepared for a little trouble. She testified that he seemed upset and frightened. At Mrs. Stein's request, a friend Herbert Gross and her brother Jack Lichstein came to the Stein home. Gross spoke to Stein on the telephone and was informed that Stein was to be at the prosecutor's office the next morning "and that George Pelletieri was representing him."

That evening Pelletieri spoke with Schragger at a testimonial dinner. Pelletieri told Schragger that he had spoken to Stein and would bring him to into the office in the morning. Pelletieri asked Schragger if Stein was a "target." Schragger responded that "it was possible that he was a target", but did not tell Pelletieri that complaints had been prepared.

On May 24, the next morning, after briefly conferring with each other, Stein and Pelletieri went to Assistant Prosecutor Richard Altman's office. Altman had conducted the entire investigation into the Gordon robbery. At the time of this meeting with Stein, Altman had concluded that Stein was involved in attempted obstruction of justice and was guilty of the original conspiracy to steal money from Gordon. His "primary purpose" was

> to bring him in and to see if I could elicit from him a voluntary confession that would be admissible in the Court of Law, and the reason why I was doing that at that time is that he was a prominent figure in the community. He was an attorney * * * I did not want to be in a position where the Mercer County Prosecutor's Office indicted a man, and we did not have a strong case. So, I, one of the reasons that I wanted to bring him in, in the event to obtain a confession which I believed would be voluntary and admissible in a court of law.

Altman's secondary purpose was to give Stein an opportunity to explain and to obtain his cooperation.

Altman had set up a recording device that, unknown to Pelletieri and Stein, taped the entire conversation in his office that morning. Present at the meeting were Altman, Sergeant Logan, Pelletieri and defendant.

Pelletieri asked Altman what he wanted with defendant, saying "I'm here as a friend of his not as an attorney." Altman answered that "it's hard to distinguish between friend and attorney at this moment," and stated,

> what I had to tell Mr. Stein, I preferred to tell him in private and what I have to tell him I think is for his own welfare, his own best interests * * *. I mean that I am going to tell him something rather than to ask him to tell me something.

Pelletieri objected to this "rather unusual procedure." He stated that Schragger had informed him that Stein might be a "target."

He further stated that because of this, he would represent Stein and did not represent anybody else in the case "as of now that I know of"; that he would not represent Testa, although Testa had asked him for such representation, and that he would not represent Pontani even though he had already spoken to Pontani. Altman said that he understood that Pelletieri was also representing Tassone. Pelletieri stated that he represented Tassone in another matter, a false swearing case, and asked what Tassone was charged with in connection with defendant. Altman said that Tassone was charged with everything Testa was. He also stated that his interest in Stein was different from that in Tassone, Pontani, Farinella and Fioravanti, since Stein was an attorney and the others were professional criminals. He suggested that Stein could hear him out and "if he wants to walk out of here, he can walk out of here, if he wants to walk out of here and confer with you he can do that as well."

After Stein advised Pelletieri that he would not answer Altman's questions, even if propounded, Pelletieri left the room.

Altman then told Stein that the matter was very serious, to which Stein replied, "I'm frankly scared shitless." Altman stated that Stein was called in because "I personally believe that you've made some poor errors in judgment" and that Stein should switch his allegiance from Pontani to the police. Altman said that he asked Pelletieri to leave because the latter had spoken with Pontani, he might represent Tassone and Tassone was not a "nice gentleman." He also said that Farinella was a "killer." He continued:

> We're asking you to be totally candid with us and we will treat you fairly in return and I think we can guarantee your safety as well and I think that I can convince you that you wouldn't be in any danger.

Altman explained that Pontani was concerned about Stein and what he might say. He said that Pontani knew that there "are contracts to kill men out because of this case", and "because of this case close personal friends of yours, who were first in it the first day this thing went off, were almost killed." Altman said he would play tapes for Stein, but he was hesitant to give Stein information, since he did not know how far he was going to cooperate with the police. Stein said, "Of course I'll give you everything I have." Altman said,

> Alright, what I want to get across to you is we're not interested in anything you may have done. We are talking about organized criminals right now and * * * we want you to, so to speak, break down and put your trust in us, in the right place and we'll give you treatment in return which will be fair and just for you.

Altman played a snatch of a tape for Stein to indicate that Pontani did not have much confidence in Stein. Altman again asked Stein to cooperate and said,

Well, that's why Mr. Schragger asked me to have you down here. Not only your immediate family but close friends of yours are involved and relatives.

Stein asked whether he could cooperate and still be represented. Altman said that he was going to disclose information to Stein that Stein would not want Tassone's attorney to know. Stein stated he could not help the police in any way concerning anyone but Pontani. Stein asked where he would stand in that event. Altman answered,

I can't say to you that you're not gonna be exposed to any criminal liability at all. *It depends on what you say to me.* It's a possibility, but I can say this to you, that you will be no where in the type of jeopardy that these men are *if you do cooperate with us.* You certainly won't have to worry about being deprived of your freedom. * * * [D]*epending upon what you are willing to do, you may not be deprived of your freedom * * *.* [Emphasis supplied]

Stein asked about the publicity his cooperation might get. Altman said that Testa and Stasio would not get out of jail.

Stein advised Altman that his inclination was to tell everything he knew, but he wondered how he could explain it to Pelletieri. Altman stated that Pelletieri should not know of Stein's cooperation, because he represented people who were a "tremendous threat" to Stein. Stein said that he would rather not talk to Altman in Pelletieri's presence and suggested that they meet at State Police Headquarters. Altman and Logan agreed.

Altman left the room. Logan told Stein that there were already "contracts" out on people, that there were assassinations planned. Logan said that Farinella is "a hit man. He will kill you as quick as spit."

Altman and Pelletieri entered. Altman said that he had advised Pelletieri that thus far he had not heard Stein's story and that he might ask Stein to take a polygraph test.

Stein, in Pelletieri's presence, then proceeded to explain the circumstances behind his giving Pontani the $5,000. He said that he had aided Pontani in the past and that Pontani needed money urgently, apparently to arrange bail for somebody, which Stein gave him. Stein said he would discuss the feasibility of a polygraph test with Pelletieri. Altman assured Pelletieri that he was not going to "hold" Stein.

Pelletieri told Altman not to serve Stein with a subpoena and took responsibility for Stein's availability. Pelletieri added that "if it comes to shove and push of course I'll have to step out of Tassone's case, is he involved with Tassone at all? Pelletieri informed Altman that Stein had told him the same story as he had given Altman with respect to his lack of contact with or knowledge of Tassone. Altman said "I suppose from that you couldn't see a conflict." Pelletieri then stated that he would produce Stein the next day if Altman wanted him. He requested as a favor to de-

fendant and his family, that the prosecutor not call Stein until "you are ready to use him towards the end of your investigation."

Altman indicated to Pelletieri that the latter would have to determine whether he could represent both Tassone and Stein. Pelletieri stated that he would speak to Tassone and then make a decision in that respect.

Stein testified that Altman's statements out of Pelletieri's presence made him extremely frightened for himself and his family, even more so than before. He felt from Altman's comments that the only way he could protect himself would be to trust Altman and the prosecutor's office, rather than Pelletieri, since he would be in danger if he confided in Pelletieri. Stein knowingly agreed with Altman to deceive Pelletieri.

As arranged, Stein immediately left in his own car for the Princeton State Police barracks. Altman, Diszler and Logan also drove there. When they arrived, defendant was in a room with Sergeant Bardzak: Neither Altman nor anyone else in the room informed Stein of the *Miranda* warnings. Defendant proceeded to give a statement in a narrative form after Altman asked him to "give us everything in a chronological order." Stein gave a statement implicating himself in a conspiracy to burglarize the Gordon home, and under questioning, in a conspiracy to obstruct justice.

Diszler had set up a recording device, without Stein's knowledge. Diszler also took notes, which he incorporated in a report, when it was discovered that the recording apparatus had misfunctioned. According to Diszler's notes, Stein began his first statement by indicating a strong willingness to cooperate. Stein stated that he did not wish Pelletieri to be present, since the latter would then know about some of the events he was going to relate.[1]

After giving the statement, Stein asked Altman what would happen to him. Altman said that no promise could be made but added that Stein's cooperation would be made known to the court. Altman said that there was a strong possibility that Stein would go to jail.

Altman then called Schragger and informed him that defendant had confessed. Schragger and State Police Lieutenant Toth arrived. Toth administered a polygraph test to Stein. Stein was informed of his full *Miranda* rights for the first time prior to the polygraph test. He signed a waiver of these rights.

After the polygraph test, Stein agreed to give a formal statement. It was given at 4:40 p.m. on that day, May 24, 1973, in the presence of Logan and Diszler. The *Miranda* warnings were not re-

---

[1]This first statement is substantially the same as that given by Stein later in the day at 4:40 p.m. at State Police headquarters, after *Miranda* warnings were given. The details of the latter statement are discussed hereafter.

peated or made part of the formal statement. The statement contained the information in the following paragraph.

Logan advised Stein that he wanted him to understand that he was giving a free and voluntary statement concerning an investigation into a robbery and kidnapping. Stein gave his age, 46, and stated that he was an attorney who was also engaged in real estate development. He became involved with Pontani as an attorney. Stein was introduced to Pontani by a woman, Wilson Marcello. Stein knew that Pontani was a professional second-story man who was in financial difficulty. Stein was also in financial straits. It was suggested that if they could locate a home where there was cash, Pontani would burglarize the home. In the course of a casual "almost flippant" conversation on the subject, Stein ventured some names from the area in which he resided, including that of Dr. Gordon. Stein knew that Gordon, a dentist, took cash home. He estimated the amount at less than $10,000 but he did not know where the money was kept. During the course of subsequent conversations over a long period of time, Stein, in response to Pontani's questions, offered such information as the number of people in the Gordon household and where and when the children went to school. Although there was no specific discussion as to Stein's share of the money to be stolen, Stein anticipated that he would participate therein. The attempted robbery occurred anywhere from 9 months to a year after the last conversation on the matter. After two months Stein assumed that no crime would occur. However, he did nothing in the interim to prevent it from happening. After the robbery and other crimes took place, Pontani advised Stein by telephone that the people who had tried to pull off the job had no right to do it, since "they had really in effect stolen information that he had given to another party [Joe Bradley] and that he had abandoned the idea long since." Pontani insisted he had nothing to do with it. Stein had assumed that any attempted larceny would be in the form of breaking and entering while the Gordons were away, not a "personal confrontation." He gave Pontani the information as to when the Gordons were on vacation. Subsequently, Pontani told Stein that he had been approached by someone who was looking for money for attorney fees for the men who were in jail. Stein informed him that he was not responsible for them. Pontani thereafter advised Stein that Testa needed $6,000 to make bail. Pontani implied that the person had threatened him. Stein agreed to lend him the money. Pontani indicated that if Testa were not released on bail, Stein would be implicated. If Testa were so released, Testa would leave the country and not testify. On May 20, Pontani met Stein and told him that a Mr. Fioravanti would speak to Testa and make sure the request was bona fide. The next morning Stein gave Pontani $5,000 in $100 bills. That day Stein received a telephone call from a Mr. De Angelis (actually Detective Moaba) who said that Pontani had run out on him. Stein stated that prior to the robbery he had never heard of Tassone, De Angelis, Testa or

Fioravanti. A few days thereafter, Stein met Wilson Marcello in a bar in Stroudsburg. She indicated to Stein that people involved with Pontani, who was now in jail, had discussed the situation, that Pontani was not going to implicate Stein and Stein should not make any statements to the prosecutor. By this time, Stein had already been approached by the prosecutor. Stein told Marcello he would meet with the prosecutor as planned on May 24. On May 23, Stein asked attorney Pelletieri to accompany him to the prosecutor's office. He then felt he was in personal danger.

After the events on May 24, 1973 defendant maintained an ambivalent relationship with Pelletieri until June 6 when the latter informed defendant he could no longer represent him. The prosecutor's office had encouraged defendant to permit Pelletieri to believe that defendant was still relying on his representation. But on June 2 defendant began to tell Pelletieri that he had been lying to him and cooperating with the prosecutor all along, and he then broke down and began weeping.

I

Defendant contended before the trial court and the Appellate Division that his statements to the prosecutor should be suppressed by reason of (a) the interference by the prosecutor with his client-attorney relationship with Pelletieri; (b) the involuntariness of the statements by reason of prosecutorial promises of leniency coupled with threats; or (c) the two factors in combination amounting to a violation of his constitutional rights, culminating in defendant's giving of the incriminating statements as the fruit of the illegal official conduct.

The lower courts, in effect, found it dubious whether Pelletieri actually represented defendant on the morning of May 24 and determined that in any event defendant had voluntarily waived his right to be represented by counsel, in connection with his making the incriminating statements.

Our careful scrutiny of the record convinces us that the prosecutor's office did impermissibly interfere with the defendant's access to legal advice and consultation on the criti-

cal morning of May 24. Defendant is entitled to the benefit of any reasonable doubt as to whether, had that interference not taken place, he would have given the State the statements in question.

We are not concerned with defendant's subordinate arguments (a) that his *Miranda* rights (*Miranda v. Arizona,* 384 *U. S.* 436, 86 *S. Ct.* 1602, 16 *L. Ed.* 2d 694 (1966)) were violated in that he was not given the requisite warnings before making the oral statement preceding the formal written statement; and (b) that by virtue of the filing by the prosecutor of formal criminal complaints against him the preceding day (May 23) his absolute right to counsel matured under *Kirby v. Illinois,* 406 *U. S.* 682, 92 *S. Ct.* 1877, 32 *L. Ed.* 2d 411 (1972). Neither of those considerations is material in view of the circumstance that defendant was actually attended by counsel when he visited the prosecutor's office and must be presumed to have intended to be advised by him in relation to the impending conference. The critical inquiry narrows to whether the prosecutor's actions on that occasion and the reaction thereto of the defendant, in combination, produced an intolerable invasion of the right of counsel by the State, and, if so, whether that conclusion becomes immaterial because of defendant's ultimate acquiescence.

Preliminarily, we entertain no doubt that in substance Pelletieri was present on the specific occasion to advise the defendant as a lawyer and that defendant so regarded him when they arrived together on the scene. This must have been equally apparent to Altman, the assistant prosecutor. Further, Schragger, the prosecutor, and Pelletieri had an understanding the prior evening that Pelletieri would bring defendant to the office on May 24. The preliminary observation by Pelletieri that he was there as a friend, not an attorney, is not significant in the light of the whole episode. It was followed within a minute or two by Pelletieri's statement "And now I must tell you that I will represent him. I do not represent anybody else in this

case as of now that I know of." It was simply wrong for Altman to induce an attending lawyer for the defendant to leave the room so that Altman could influence defendant to make incriminatory statements without the potentially deterring presence of counsel.

The State's purported defense of this tactic as designed to protect defendant from the danger of Pelletieri's adverse interest in other suspects involved in the criminal affair will not hold water. The State was itself in a totally adverse posture *vis-a-vis* defendant and not in a proper position to advise defendant how, when and by whom he should or should not be represented. This was particularly true when the advice was calculated to induce the defendant to forego representation *by anyone* while confessing his implication in the matter. Altman made it clear to defendant that his options would run out that day, that Altman could have him in jail that afternoon, that if his cooperation was satisfactory he, as an attorney "and a legitimate member of the community", would "certainly" not be incarcerated and that the State would provide him with physical protection, particularly from persons who Altman implied were or might be represented by Pelletieri. Altman rejected defendant's plaintive query, "Can't I give you my cooperation and also be represented?" Defendant was thus subjected to the double effect of heightened anxiety over his legal and physical welfare and deprivation of the counsel of his attorney in weighing the alternatives open to him. His capitulation to these influences under such circumstances cannot fairly be equated with the concept of a voluntary waiver of a constitutional right.

It would be a work of supererogation to enumerate all the cases, state and federal, stressing the primacy of the right of counsel in the constitutional armament of persons suspected or accused of crime. Without the benefit of counsel many of the other protections in the Bill of Rights would be lost or seriously diluted. See *Johnson v. Zerbst,* 304 *U. S.* 458, 468, 58 *S. Ct.* 1019, 82 *L. Ed.* 1461 (1938);

*Massiah v. United States,* 377 U. S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964); *State v. Green,* 46 N. J. 192, 200 (1965), *cert.* den. 384 U. S. 946, 86 S. Ct. 1475, 16 L. Ed. 2d 544 (1966).

In contending that defendant here effectively waived his right of counsel, the State cites *State v. McKnight,* 52 N. J. 35 (1968). The case is not apposite. The core issue there was whether an arrested suspect, who, after being warned of his right to counsel, nevertheless volunteers his implication, can prevent the use of the statement on absence-of-counsel grounds. But the contention there was merely that establishment of waiver requires a showing of an "intelligent" act in the sense that defendant understood all the legal implications of his statement. *Id.* at 46–49. In holding to the contrary, this court was not there faced, as we are here, with the psychic effect on the mind and volition of a suspect of pressures, blandishments and fears deployed by State activity designed to elicit a surrender of a constitutional right. As the court said of the defendant's confession in *McKnight,* "there can be no suggestion that the State sought to overreach defendant in any way. The prosecutor scrupulously respected defendant's right to counsel and accepted defendant's confession only after defendant himself, fully advised of his rights, said he wanted to talk * * *. He does not claim any mistreatment, or any pressure to speak." *Id.* at 42. That situation is in obvious contrast to the one before us here.

We here hold that defendant's discarding of his counsel consequent upon Altman's representations after Pelletieri left the room on May 24 and his subsequent decision to make a clean breast of the matter to the prosecutor without informing Pelletieri thereof were not a voluntary waiver of counsel. We so determine on the basis of a factual record which is clear and convincing[1] that defendant's free

---

[1]But the burden of proof as to this issue at the trial level was on the State. *Evid. R.* 8(3).

judgment and volition were unduly overborne by the activities of the prosecutor's office calculated to result in the eventuality which in fact transpired — a confession made without benefit of counsel. See *Bram v. United States,* 168 *U. S.* 532, 542–543, 18 *S. Ct.* 183, 42 *L. Ed.* 568 (1897); *Shotwell Mfg. Co. v. United States,* 371 *U. S.* 341, 347–348, 83 *S. Ct.* 448, 9 *L. Ed.* 2d 357 (1963); *Grades v. Boles,* 398 *F.* 2d 409 (4th Cir. 1968); *Harris v. Beto,* 367 *F.* 2d 567 (5th Cir. 1966). Moreover, it goes without saying that the fact that defendant was himself a lawyer does not derogate from his right of counsel and to complain of unconstitutional impairment or deprivation of that right. See *State v. Sarcone,* 96 *N. J. Super.* 501 (Law Div. 1967); *Glasser v. United States,* 315 *U. S.* 60, 62 *S. Ct.* 457, 86 *L. Ed.* 680 (1942). As stated in the last cited case, "The fact that Glasser is an attorney is, of course, immaterial to a consideration of his right to the protection of the Sixth Amendment". *Id.* at 70, 62 S. Ct. at 465.

█ The vulnerability on the stated grounds of the statements given by defendant on May 24, 1973 must be held to extend to those he gave the prosecutor subsequently, the latter clearly being the fruit of the illegality resulting in the obtaining by the State of the former.

As the motion to suppress was erroneously denied, the consequent adduction in evidence of the statements was error which requires a reversal of all the convictions independent of the other grounds of attack upon some of them advanced by defendant.

## II

The Appellate Division reversed the convictions of the defendant on the substantive charges of assault with an offensive weapon (against Edith and Shelly Gordon), kidnapping, kidnapping while armed and assaults on a police officer. It sustained that of armed robbery. The former were deemed not within the scope of the original conspiracy,

under the principles stated in *State v. Madden,* 61 *N. J.* 377 (1972). We review this ruling pursuant to our grant of the State's cross-petition for certification.

The question as to the criminal responsibility of a conspirator for the commission by others of substantive offenses having some causal connection with the conspiracy but not in the contemplation of the conspirator has been a matter of considerable debate and controversy. Here there is no question but that Stein did not actually contemplate any criminal consequence of his "tip" to Pontani beyond a burglary and theft of money from the Gordon home. The trial court applied the conventionally stated rule that each conspirator is responsible for "anything done by his confederates which follows incidentally in the execution of the common design as one of its probable and natural consequences, even though it was not intended as part of the original design", citing 15A *C. J. S. Conspiracy* § 74 at 825; and see *Pinkerton v. United States,* 328 *U. S.* 640, 66 *S. Ct.* 1180, 90 *L. Ed.* 1489 (1956); *cf. State v. Carbone,* 10 *N. J.* 329 (1952); *State v. Cooper,* 10 *N. J.* 532 (1952).

The Appellate Division regarded the doctrine as restricted in this State by virtue of *State v. Madden, supra.* We find ourselves unable to agree with the implication of the Appellate Division, that anything stated in *State v. Madden* was intended to modify in any substantial sense the rule quoted above as applied by the trial court. Madden was not directly concerned with liability of a conspirator for an act consequential to but not specifically the subject of the conspiracy — the problem confronting us here.

In *Madden* there was a prosecution for the murder of a policeman killed in the course of a mob assault upon him consequent upon a racial disturbance. The trial court, in instructing the jury on aiding and abetting, said that if the defendants conspired to do an unlawful act in the course of which there was a killing, they could be held responsible therefor. 61 *N. J.* at 392. This court disap-

proved that instruction, pointing out there was no evidence of an agreement made in advance of the criminal event. 61 *N. J.* at 394. If there had been, it would have been "appropriate to tell the jury of the common liability of all with respect to the ensuing substantive offense". *Id.* The court felt that the defendants were harmed by the possible understanding by the jury, from the charge, that even if the defendants did not participate in inflicting the fatal injuries, there was nevertheless evidence to infer a conspiracy to kill which would then operate to inculpate the defendants with all the acts of the killers. The harm lay in the absence of proof justifying a finding of such a conspiracy by defendants, 61 *N. J.* at 395, not in the unacceptability of a rule of law justifying liability for a killing on the part of all who in fact conspired to such a purpose.

The Appellate Division may have been influenced by this court's concern in *Madden* with the possible understanding of the jury from the charge that there would be vicarious liability for murder if the defendants conspired to do *any* unlawful act, *e. g.*, to pursue the victim, and the killing occurred in the course of that act. 61 *N. J.* 395. But the implication of non-liability for the killing in that context is not at all inconsistent with the generally held rule, exemplified by the leading *Pinkerton* case cited above, that so long as a conspiracy is still in existence " 'an overt act of one partner may be the act of all without any new agreement specifically directed to that act,' " provided the substantive act could "be reasonably foreseen as a necessary or natural consequence of the unlawful agreement". 328 *U. S.* at 646–647, 647–648, 66 *S. Ct.* at 1184.

We regard the rule as just stated to be sound and viable. See *People v. Smith,* 63 *Cal.* 2d 779, 48 *Cal. Rptr.* 382, 409 *P.* 2d 222, 232 (Sup. Ct. 1966), *cert.* den. 388 *U. S.* 913, 87 *S. Ct.* 2119, 18 *L. Ed.* 2d 1353 (1967); *State v. Smith,* 221 *N. C.* 400, 20 *S. E.* 2d 360, 364 (Sup. Ct. 1942); *Rodriguez v. United States,* 284 *F.* 2d 863 (5th Cir. 1960)

*cert.* den. 368 *U. S.* 1001, 82 *S. Ct.* 632, 7 *L. Ed.* 2d 540 (1962). We hold it represents the law of this State.

■ It remains to apply the rule to the instant fact situation. Ordinarily the matter of factual application of the rule would be submitted to the jury under appropriate instructions. Here the matter was for the trial judge in the first instance as fact-finder. The Appellate Division found correct the trial ruling that the armed robbery was within the scope of the conspiracy to steal currency from the Gordon home. We are in agreement. The robbery was a "natural" or "probable" consequence of the conspiracy. But the Appellate Division concluded that the assaults with an offensive weapon on the wife and daughter of Dr. Gordon were "not connected with the robbery as such" but "with the preliminary acts of taking the Gordons as hostages and the eventual kidnappings" and therefore "not fairly * * * part of the conspiratorial agreement". The assault convictions were therefore set aside.

■ We are not in complete agreement with this last determination. The brandishing of handguns by the robbers when they first encountered Dr. and Mrs. Gordon in the house was clearly a foreseeable event in the course of an unlawful invasion of the house for criminal purposes by armed men. That assault on Mrs. Gordon did not merge with the armed robbery, as the Appellate Division suggested might be the case, since the robbery charged was of Dr. Gordon alone, not the members of his family assaulted. Thus the assault conviction as to Mrs. Gordon should not have been set aside as too remote from the conspiracy.

As to the charge of assault with an offensive weapon on Shelly Gordon (daughter of the Gordons), since the evidence indicates that offense occurred only at the time of the attempted escape from the police, its disposition depends on the determination as to the other associated charges, discussed next below.

Liability of the defendant for the kidnapping, kidnapping while armed and assaults on a police officer presents a much closer question. The Appellate Division held that these substantive acts were "offenses committed by the criminals effecting the conspiratorial specific crime after that crime had been committed, as part of a plan to flee when it became evident that they were about to be apprehended" and that defendant could not be charged therefor. On balance, we are satisfied that this is a correct result, particularly in relation to the kidnapping phases of the episode. Cf. State v. Hampton, 61 N. J. 250, 275–276 (1972). This holding will also apply to the reversal by the Appellate Division of the conviction for assault with an offensive weapon on Shelly Gordon. However, we rest our concurrence with the Appellate Division not on the ground that the substantive offenses took place subsequent to the commission of the crime conspired or that the offenses were part of a plan to flee, but rather that it would be unreasonable for a fact-finder to find as a fact beyond a reasonable doubt that they were necessary, natural or probable consequences of the conspiracy, having in mind the unique fact-complex presented.

### III

Defendant has contended at all times that his obstruction of justice convictions should be set aside on grounds of entrapment. The trial court and the Appellate Division found to the contrary, but Judge Crane dissented on that point in the latter tribunal. It was his view that the intent to commit this offense originated with the police rather than defendant. The majority thought otherwise, regarding defendant as predisposed to commit the offense in order to cover up crimes he had already committed.

The issue has two branches: (a) would the defense of entrapment stand if the police had approached defendant directly; (b) if so, may the defense be raised although

defendant was approached through the intermediary Pontani?

## A.

New Jersey stands with the federal entrapment cases restricting the defense to those accuseds who have no predisposition to commit the crime induced by the government agents. *State v. Dolce,* 41 *N. J.* 422, 433 (1964); *United States v. Russell,* 411 *U. S.* 423, 427, n. 4, 93 *S. Ct.* 1637, 36 *L. Ed.* 2d 366 (1973); *Hampton v. United States,* —— *U. S.* ——, 96 *S. Ct.* 1646, 48 *L. Ed.* 2d 113 (1976), 44 *U. S. L. W.* 4542, 4543. But what distinguishes this case from the generality of those in which the defense is raised, is that, in the latter, predisposition is relatively easy to establish by evidence of prior activity in the same area as that for which defendant is being prosecuted, *e. g.*, narcotics, gaming, etc. Here, defendant's demonstrated criminal disposition was in relation to burglarizing the Gordon home, not the obstruction of justice for which he was convicted. Nor is there any indication that this project was other than a single aberrant episode in defendant's life. It is a matter of pure speculation as to whether defendant had a predisposition to commit obstruction of justice in general.

The State suggests that what matters is defendant's predisposition to commit this specific offense in these particular circumstances. However, there is no proof thereof other than the fact that he accepted the proposal put to him by Pontani. If that is regarded as sufficient to refute the defense, little would be left of it, as the State then could always point to the induced act as the self-sufficient proof of predisposition.

The reported cases closest to the situation here presented are *United States v. Klosterman,* 248 *F.* 2d 191 (3d Cir. 1957), and *United States v. Mathues,* 22 *F.* 2d 979 (E. D. Pa. 1927). In both these cases, defendants had been en-

gaged in criminal activity: falsifying tax returns, in *Klosterman;* running an illegal brewery, in *Mathues*. In both, after preliminary negotiations not relevant here, federal agents actively solicited bribes, after which defendants were arrested on bribery charges. Entrapment was found in both cases. The reasoning in *Mathues* is particularly pertinent:

> If, as in the instant case, the investigator induces the commission of an offense *not an essential part of the business* of manufacturing and selling liquor unlawfully, but a crime to which he himself must be a party, and, under the evidence, there has been no intention on the part of the entrapped to commit such an offense until he was lured into it, the policy of the law will not permit a prosecution based on such entrapment to be carried on. [22 *F*. 2d at 980; emphasis added].

*State v. Dolce, supra,* relied on by the State and both courts below, also involved a defendant suspected of one crime (unlawful possession of motor vehicle title certificates) and entrapped by an opportunity to commit a related crime (unlawfully stamping the certificates with an official seal). The defense of illegal entrapment in a prosecution for the unlawful possession was not allowed.

It is obvious that *Dolce* is not factually in point here. Defendant there was not being tried for the crime into which he was enticed by the police agents. That enticement was solely to obtain evidence of the prior crime which defendant had committed independent of police involvement. We are aware of no authority allowing the defense of entrapment in that context. If the law enforcement authorities in the present case had been content merely to use the results of their stratagem with defendant as evidence of his complicity in the conspiracy, not as the subject matter of the distinct additional charge of obstruction of justice, *Dolce* would be precisely in point and the defense of entrapment not available. See *United States v. Mathues, supra,* 22 *F*. 2d at 980.

The *Klosterman* and *Mathues* cases, *supra,* are *a fortiori* authority in favor of defendant's position. The defendants

in those cases were continuing to commit the underlying crimes. It is credible that Stein, as he argues, had long since dismissed the conspiracy from his mind. In any event, as noted above, his personal involvement consisted of a single act rather than an ongoing course of conduct.

We conclude on this phase of the issue, that the finder of fact could not properly find beyond a reasonable doubt that defendant had a predisposition toward obstruction of justice or conspiracy to obstruct justice so as to negate the defense of entrapment.

### B.

The effect of the participation in the alleged entrapment by Pontani, a non-police intermediary, was not discussed by the Appellate Division, which did not need to reach it. The general principle is that the entrapment defense does not extend to inducement *by* a private citizen; yet it has found general application to cases when the officer acts *through* a private citizen. *Johnson v. United States,* 115 *U. S. App. D. C.* 63, 317 *F.* 2d 127, 128 (D. C. Cir. 1962).

The State relies upon certain federal cases which appear to hold that if a government agent, concealing his identity as such, induces a third person, acting for his own gain, to involve the defendant in a criminal enterprise, the defense of entrapment will not lie. *United States v. Comi,* 336 *F.* 2d 856 (4th Cir. 1964). The rationale seems to be that the intermediary cannot be regarded as a government agent, for entrapment purposes, if he did not know he was so functioning. 336 *F.* 2d at 860; *United States v. Romano,* 278 *F.* 2d 202, 204 (2d Cir. 1960).

The reasoning of the cited cases evades us. If an intermediary is intended and used by the government as an instrumentality to entice the defendant into a crime he would not otherwise have committed, what difference should it make that the intermediary is ignorant of the fact that

the government is using him for the stated purpose? The public policy underlying the defense of entrapment remains relevant: that the courts should not construe a criminal statute to intend that "its processes of detection and enforcement should be abused by the instigation by government officials of an act on the part of persons otherwise innocent in order to lure them to its commission and to punish them." *Sorrells v. United States,* 287 *U. S.* 435, 448, 53 *S. Ct.* 210, 215, 77 *L. Ed.* 413 (1932).

The instant record cannot be read other than to indicate that the prosecutor's staff "instigated" defendant to participate in the plan to free Testa, and this notwithstanding the use of the unwitting Pontani toward that end. Since, as already noted, the fact-finder could not reasonably find predisposition on the part of defendant for conspiracy to obstruct justice or obstruction of justice, the defense of entrapment on those counts (including the modified charge of intent to obstruct) must be sustained.

The judgment of the Appellate Division is reversed in part, and affirmed in part, conformably with this opinion. Remanded for a new trial on the charges of conspiracy to steal currency, armed robbery, and assault with an offensive weapon on Edith Gordon; the charges on the other counts are to be dismissed. The impoundment order heretofore entered is vacated.

*For affirmance in part and reversal in part*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER and Judge CONFORD—7.

*Opposed*—None.